## A07A1270. DuCOM v. THE STATE.
### (654 SE2d 670)

ELLINGTON, Judge.

A Glynn County jury found Shan DuCom guilty of theft of a trade secret, OCGA § 16-8-13; theft by taking, OCGA § 16-8-2; and computer theft, OCGA § 16-9-93 (a). DuCom appeals from the judgment of conviction, raising the general grounds and contending the court erred in charging the jury and in calculating the amount of restitution owed. Finding no error, we affirm the convictions. However, we vacate DuCom's felony sentence for theft by taking and remand for resentencing as explained in Division 3.

When a criminal defendant challenges the sufficiency of the evidence supporting his or her conviction, "the relevant question is

---

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 318-319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979). The jury, not this Court, resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from basic facts to ultimate facts. Id. "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." (Citation and punctuation omitted.) *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001). Viewed in this light, the record reveals the following facts.

Culver and DeLoach ("C & D"), a real estate brokerage, development, and property management business located on St. Simon's Island, hired Shan DuCom in 1998 to run the property management division. Business partners Edward "Pete" Culver, Jr., and Frank DeLoach were the only owners of C & D. C & D hired DuCom as a salaried employee and structured her pay to include commissions and bonuses based upon the profits she generated for the property management division. C & D paid all the expenses of the division and controlled the hiring decisions. The partners entrusted DuCom, a licensed real estate agent, with the division's business and gave her wide latitude to develop it. Under DuCom's direction, the property management division grew from about 15 clients in 1998 to over 100 in 2003, with an estimated value of $200,000 to $225,000. In 2003, DuCom earned about $130,000 in salary, commissions, and bonuses.

The State adduced evidence from which the jury could infer that DuCom, as a licensed real estate agent, owed a duty of loyalty to her broker, C & D. DuCom, however, treated the property management division as her own and believed she was entitled to take C & D property and business with her when she left the firm. DuCom testified that she was a partner in a joint venture and believed she had at least a 60 percent ownership interest in the property management division. She referred to C & D's property division master client list as "my owner's list." The State demonstrated that DuCom acted on that belief and in 2003 she began executing a plan to convert C & D's property management division into her own company.

In the fall of 2003, DuCom studied to obtain her real estate broker's license. During those classes, she told a fellow realtor that she planned to leave C & D. In September 2003, DuCom photographed a building on Ocean Boulevard that she intended to buy and which eventually housed Real Escapes, Inc., the property management firm DuCom shortly thereafter formed and ultimately incorporated on January 8, 2004. On October 19, 2003, DuCom created a document on her C & D computer outlining a plan for Real Escapes,

Inc., to "retain all current business" from C & D. On November 18, 2003, DuCom signed a contract to purchase the Ocean Boulevard property. She closed on the sale of that property in January 2004. In November 2003, DuCom contacted a former C & D property manager and asked her how she was able to take some C & D clients with her and what the consequences of that were. The former manager advised DuCom that the clients belonged to the broker. On December 3, 2003, DuCom met with the property management staff about her new company and discussed whether the staff would collectively or individually inform C & D that they had agreed to go with DuCom to Real Escapes, Inc.

During January 2004, DuCom, using C & D computers, created a number of documents for the benefit of Real Escapes, Inc., including the company letterhead and logos, press releases, solicitation postcards, and various "to do" lists. DuCom was not authorized to use C & D computers for her personal use. One of DuCom's lists noted "Entech," as a "to do" item.

Entech is the password-protected computer software C & D purchased to manage its clients' vacation and rental properties and from which the master client list is generated. Only C & D employees were allowed to use the software, and they were not permitted to copy it for use outside the office. The general public was not allowed into the property management division unsupervised, and was not allowed access to the Entech software. The State also adduced evidence that the property management division was managed by a licensed real estate agent, one who should have known that the agent owes a duty of loyalty to the broker, and who would understand that client contact information is something C & D's agents "guard like gold."

While DuCom was planning to start her own business, C & D's partners remained unaware of her intentions. Instead, as the property management division grew, the partners considered moving it and DuCom out of the C & D building into a new location, one that would require the division to pay rent, which would reduce DuCom's income. One employee, however, did notice DuCom putting files into green and white boxes. DuCom told this employee that she was moving files into storage. These boxes were later found in the offices of Real Escapes, Inc.

In late January 2004, DuCom told Pete Culver that she intended to quit and asked him to sign a document allowing her to take C & D's property management clients with her. Surprised, Culver informed DeLoach of DuCom's intentions, and DeLoach later called DuCom and discussed the possibility of selling her the property management division. On February 3, 2004, Culver informed DuCom that the property management business was worth between $200,000 and $225,000. At 2:26 p.m. that same day, someone copied C & D's

property management division master client list from the C & D computer hard drive. One of C & D's employees witnessed DuCom working on the computer that afternoon. On February 4, 2004, Culver offered to sell DuCom the property management division's book of business, that is, the master client list, for $100,000; DuCom countered for $10,000 and again asked Culver to sign the agreement relinquishing C & D clients to her. That afternoon, DuCom downloaded to disks the bookkeeping and financial data pertaining to seven homeowner associations that C & D managed. About an hour later, C & D asked DuCom to leave and escorted her from the building. Shortly thereafter, the three C & D employees that DuCom managed resigned. The next day, the entire former C & D property management division reported to work at Real Escapes, Inc., on Ocean Boulevard.

The remaining C & D employees came to work the next day and found a property management office that had been left barren, "cleaned out." The computer server was turned off, the hard copies of client files were missing, the fax and credit card phone lines had been sabotaged, and office supplies and equipment were missing. When C & D finally restored its computer service, it discovered that entire databases were missing, including the computer operating files for the homeowner association clients. Even the C & D property management website had been transferred to Real Escapes, Inc.

The State's computer experts testified that DuCom copied a "massive" amount of information from C & D's hard drive onto disks on February 4, 2004, including programs such as Microsoft Access, Quicken, Excel, I-net, Quicken Books, and all of the associated data, including the homeowner association accounts owned and managed by C & D. These computer programs were registered to C & D.

On February 18, 2004, a Glynn County detective executed a search warrant at Real Escapes, Inc., and recovered many C & D documents and property management client files. The detective discovered a printout of the C & D property management master client list hidden beneath DuCom's desk. DuCom admitted taking it, albeit "mistakenly." The list was also heavily annotated, revealing that DuCom had solicited the owners. She also admitted taking the homeowner association computer files. The police seized equipment, computer disks, and computers, one of which belonged to C & D. On March 3 and 4, 2004, DuCom, through her attorney, returned additional property belonging to C & D, property which included the Entech software. Although no C & D employee testified as to the value of the entire Entech software package, DeLoach testified that it was upgraded in 2004 at a cost of $3,700.

Finally, C & D employees testified that, after DuCom took the property management division, including its employees and its main

asset, the master client list, the business was "ruined" and "stigmatized" such that it lost most of its value. C & D sold the master client list for $17,500. The State also presented evidence that DuCom caused C & D to lose commissions in excess of $21,000.

1. DuCom contends the evidence adduced was insufficient to support her conviction for theft of a trade secret, the trade secret being the C & D property management division master client list. We disagree.

Under Georgia law, the crime of theft of a trade secret is defined in relevant part as follows:

Any person who, with the intent to deprive or withhold from the owner thereof the exclusive use of a trade secret, or with an intent to appropriate a trade secret to his or her own use or to the use of another, does any of the following: . . .

(3) Without authority, makes or causes to be made a copy of an article representing such trade secret.

OCGA § 16-8-13 (b). A trade secret is defined, in relevant part, to include

. . . a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:

(A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

OCGA § 16-8-13 (a) (4).

The evidence adduced showed that DuCom, without authority, copied the C & D property management master client list, took it from the premises, and used it to solicit, retain, transfer, or otherwise appropriate C & D's clients to Real Escapes, Inc. The master client list was not available to the public, and the private information pertaining to each property owner was not readily ascertainable by proper means. The information was kept on a private computer that was password protected and accessible only by C & D employees who were supervised by a licensed real estate professional with a duty of loyalty to the broker. The master client list had a value to both DuCom and

C & D, as shown by DuCom's offer to buy it for $10,000 and C & D's ultimately selling it for $17,500. In fact, before the list was devalued by DuCom's theft, it had an estimated value of around *$200,000.* Without clients, Real Escapes, Inc., would have opened its doors with little or no property to manage, and with no property to manage, it would have very little income. The list was one from which C & D and DuCom derived economic benefit and from which other brokers could derive economic benefit if they had access to it. For these reasons, the evidence adduced was sufficient for the jury to find, beyond a reasonable doubt, that DuCom violated OCGA § 16-8-13 by taking C & D's property management division master client list.

2. DuCom contends the trial court erred in recharging the jury on the law of theft of trade secrets. As we have held,

> [i]n determining whether the recharge contained error, it is fundamental that we must look at not only the recharge but the original charge as well, as jury instructions must be read and considered as a whole in determining whether the charges contain error. Where a charge as a whole substantially presents issues in such a way as is not likely to confuse the jury even though a portion of the charge may not be as clear and precise as could be desired, a reviewing court will not disturb a verdict amply authorized by the evidence.

(Citation and punctuation omitted.) *Herrin v. State*, 229 Ga. App. 260, 262 (2) (493 SE2d 634) (1997). We have reviewed the original charge, which DuCom concedes is a correct statement of the law, and compared it with the recharge. They are substantially the same. DuCom has failed to demonstrate in her brief how the recharge constitutes error.

3. DuCom contends the State failed to present sufficient evidence that she committed theft by taking as alleged in Count 3 of the indictment because the State failed to prove she took software belonging to C & D or that any of the software had a value exceeding $500.

The record does indeed support DuCom's argument that the State failed to prove she appropriated *all* of the computer software programs (e.g., Norton Utilities, Symantec Anti-Virus Software) listed in Count 3, and that the State failed to establish the cash market values for each item allegedly stolen. However, the State did adduce evidence that DuCom possessed and eventually returned the listed Entech software, software DuCom noted on her Real Escapes, Inc. "to do" agenda, software that belonged to and had value to C & D, and which DuCom was not permitted to copy or to take outside the office. The jury was authorized, based on this evidence, to infer

DuCom's intent to steal and to find a completed theft by taking of the Entech software. *Smith v. State*, 172 Ga. App. 356, 357 (323 SE2d 257) (1984) (A person commits theft by taking when he unlawfully takes any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated. To "deprive" means, without justification, to withhold property of another permanently or temporarily.); *Yawn v. State*, 94 Ga. App. 400, 403 (3) (94 SE2d 769) (1956) (larceny may be established by circumstantial evidence); OCGA § 16-8-2. Contrary to DuCom's argument, the State was not required to prove that the software had a value in excess of $500 to support a conviction for the crime of theft by taking; rather, the evidence is relevant only to whether the offense is to be punished as a misdemeanor or a felony. *Mack v. Ricketts*, 236 Ga. 86, 87 (222 SE2d 337) (1976) ("Under the Criminal Code of Georgia there are not two theft by taking crimes, one being a misdemeanor and the other being a felony. There is only one such crime, and upon conviction for it, the punishment only is determined by the value of the property taken."); *Hight v. State*, 221 Ga. App. 574, 575 (2) (472 SE2d 113) (1996) ("Value is not an element of theft by taking as proscribed by OCGA § 16-8-2. The value of stolen property is relevant only for purposes of distinguishing between a misdemeanor and a felony. OCGA § 16-8-12 (a).") (citation omitted).

Although there was testimony that C & D upgraded its Entech software sometime in 2004 at a cost of $3,700, there is no evidence of the software's cash market value at the time DuCom appropriated it or while she possessed it. As we have held,

> [t]he cost of the property to the owner, although relevant on the question of value, is not the ultimate determinant. Rather, the proper measure of value under OCGA § 16-8-12 is the fair cash market value either at the time and place of the theft or at any time during the receipt or concealment of the property. But it is also true that the cost price, if coupled with other evidence, may be admitted as an element upon which an opinion may be formed as to the item's value. And the testimony of the owner of the value of stolen items based upon his experience in buying them, coupled with the jury's awareness of the value of everyday objects, is sufficient to allow the jury to consider such opinion evidence and make reasonable deductions exercising their own knowledge and ideas.

(Citations and punctuation omitted.) *Campbell v. State*, 275 Ga. App. 8, 11 (3) (619 SE2d 720) (2005).

In this case, the only evidence offered by the State of the software's value is what C & D paid to upgrade it at some point in 2004. If the State had proven that the upgrade took place before the theft occurred, that would be some evidence of value, if coupled with other evidence, upon which an opinion might have been formed as to the software's cash market value. Here, however, the State proved only that it was worth $3,700 to C & D to upgrade its software. The true cash market value of the original software, the software actually appropriated, was not established. Therefore, DuCom may not be sentenced for felony theft by taking. *Duncan v. State*, 278 Ga. App. 703, 708-709 (3) (629 SE2d 577) (2006). We must vacate her sentence on Count 3 and remand to the trial court for resentencing. Id.

4. DuCom contends the State failed to present sufficient evidence of computer theft, OCGA § 16-9-93, as alleged in Counts 8 through 14 of the indictment. The State alleged that DuCom used a computer without authority to appropriate the computer data pertaining to seven different homeowner associations managed by C & D. DuCom argues that the evidence demands a finding that she copied the homeowner association data with authority and in the course of her legitimate job duties. We cannot agree.

OCGA § 16-9-93 (a) defines computer theft as follows:

Any person who uses a computer or computer network with knowledge that such use is without authority and with the intention of:

(1) Taking or appropriating any property of another, whether or not with the intention of depriving the owner of possession;

(2) Obtaining property by any deceitful means or artful practice; or

(3) Converting property to such person's use in violation of an agreement or other known legal obligation to make a specified application or disposition of such property.

OCGA § 16-9-92 (18) defines "without authority" to include "the use of a computer or computer network in a manner that exceeds any right or permission granted by the owner of the computer or computer network."

DuCom admitted on the stand that although she had authority to make copies of C & D's homeowner association data for use on her home computer as a part of her C & D duties, she did not have the authority to take that data to Real Escapes, Inc. The evidence adduced shows that DuCom downloaded the homeowner association

data around 2:10 p.m. on the day she left C & D, shortly after her negotiations with C & D had broken down and long after she had formed an intent to start her own property management company with C & D's clients. Thus, there was sufficient evidence to allow a rational trier of fact to conclude beyond a reasonable doubt that DuCom used a computer, owned by her employer, with knowledge that such use was without authority and with the intention of removing programs or data from that computer and appropriating them for her own use, in violation of OCGA § 16-9-93 (a) (1). See *Fugarino v. State*, 243 Ga. App. 268, 270 (1) (b) (531 SE2d 187) (2000) (the jury may infer from the circumstances, including an employee's vindictive or retaliatory conduct, that the use was knowingly without authority).

5. DuCom contends the trial court erred in conditioning her probation on the requirement that she pay $63,000 in restitution to C & D. She contends the record did not support the amount because the trial court erred in calculating C & D's damages.

"The amount of restitution ordered shall not exceed the victim's damages." OCGA § 17-14-9. The amount of restitution recoverable in a criminal case may not exceed that recoverable in a civil action. *Lawrenz v. State*, 194 Ga. App. 724 (1) (391 SE2d 703) (1990). The sufficiency of evidence to support an order of restitution is measured by the preponderance of the evidence standard. Id. at 725 (1).

The court concluded that C & D's property management division "book of business," that is, the client inventory as reflected on the master client list, was worth $100,000, based on C & D's offer price to DuCom. Although DuCom claimed the business was only worth $10,000, the record also supports a finding that the business had a value of up to $225,000. The court also found that C & D, after DuCom had damaged the book of business, sold it for $37,000. The record shows that the business actually sold for $17,500. The State also presented evidence that DuCom caused C & D lost commissions in excess of $21,000. While DuCom speculates that her leaving would have "depreciated" the business in any event, she failed to prove that amount. Therefore, the record supports a finding that C & D suffered damages of up to $228,500. Thus, DuCom has failed to show that the $63,000 in restitution awarded was unsupported by any evidence. The record also reveals that the court properly considered DuCom's ability to pay and all the other factors set forth in OCGA § 17-14-10. We find no error.

*Judgment affirmed in part and vacated in part, and case remanded for resentencing. Andrews, P. J., and Adams, J., concur.*

DECIDED NOVEMBER 26, 2007 — 

*Bouhan, Williams & Levy, Walter C. Hartridge, David B. Dennison, Alan D. Tucker,* for appellant.

*Stephen D. Kelley, District Attorney, Jonathan R. Miller III, Assistant District Attorney,* for appellee.