A10A0408, A10A0409. FINE et al. v. COMMUNICATION TRENDS, INC.; and vice versa.

(699 SE2d 623)

BERNES, Judge.

Communications Trends, Inc. ("CTI") filed this lawsuit against its former employee, Lynette Fine, alleging claims for breach of a nonsolicitation covenant, breach of a nondisclosure covenant, violation of the Georgia Trade Secrets Act, and breach of a duty of loyalty. CTI also sued Fine's current employer, Allscope Media, alleging claims for tortious interference with its business and contractual relationship with Fine. Fine and Allscope denied CTI's allegations and filed a counterclaim alleging claims for defamation, libel and slander per se.[1] The parties filed cross-motions for summary judg-

---

[1] Fine and Allscope also alleged a claim for tortious interference with business relations, but CTI's appellate brief and pleadings indicate that they later voluntarily dismissed this claim. The voluntary dismissal has not been included in the appellate record. Regardless, the enumerations of error do not address this claim.

ment. The trial court granted both motions.[2] In these consolidated appeals, the parties challenge the trial court's summary judgment decisions. In Case No. A10A0408, we affirm the entry of summary judgment in favor of CTI as to the counterclaim. In Case No. A10A0409, we affirm the entry of summary judgment in favor of Fine and Allscope as to CTI's claims for breach of the restrictive covenants and tortious interference.[3] However, we reverse the grant of summary judgment as to CTI's claim against Fine for breach of a duty of loyalty.

"Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c)." (Citation omitted.) *Palombi v. Frito-Lay*, 241 Ga. App. 154 (526 SE2d 375) (1999). On appeal from a grant of summary judgment, a de novo standard of review applies, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. See id.

So viewed, the evidence shows that CTI is a business engaged in media planning, purchasing, and cable network programming. CTI's major clients include several well-known cable television networks. In 1995, CTI hired Fine to serve as its media planner. Fine was subsequently promoted and became a corporate vice president at CTI. Fine was the main contact for CTI's major clients, which allowed her to develop relationships with them. In the performance of her duties, Fine also had access to CTI's client lists, client profiles, and media rates. In 1997, Fine executed a "Nondisclosure and Nonsolicitation Agreement" (collectively "the restrictive covenants"), which restricted her from disclosing any of CTI's confidential information and trade secrets, and from soliciting any of CTI's clients on behalf of a third party, throughout her employment and for a period of two years following the cessation of her employment.

In June 2005, Fine had a lunch meeting with the CEO of Allscope, a media competitor of CTI, and they began to discuss the possibility of Fine becoming employed with Allscope. Fine sent a projection of the amounts that she could potentially earn for Allscope based upon competitive research, her knowledge of the billing histories of CTI's clients, and the assumption that some of the CTI clients would follow her if she were to become an Allscope employee. On October 27, 2005, Allscope gave Fine an offer of employment.

---

[2] The trial court's order failed to contain any factual findings or conclusions to explain its reasoning for granting the motions. Nevertheless, the trial court's ruling will be affirmed if it is right for any reason. See *Abellera v. Williamson*, 274 Ga. 324, 327 (2) (553 SE2d 806) (2001).

[3] CTI has not enumerated as error the trial court's grant of summary judgment on the claim for violation of the Georgia Trade Secrets Act.

Fine accepted Allscope's offer on October 31, 2005 and resigned from her employment from CTI on November 4, 2005.

Fine's last day of employment at CTI was on November 15, 2005. CTI distributed an e-mail to all of its clients, informing them that Fine was no longer employed with its company and that another CTI employee would be handling their accounts.

On November 16, 2005, Fine attended a large cable industry dinner as an Allscope employee and provided her new Allscope business cards to various executives in attendance, including executives affiliated with CTI's clients. Fine testified that she informed CTI's clients that she was not allowed to solicit them and that they would have to provide a statement in writing that she had not done so in order to continue doing business with her at Allscope. Fine further testified that if CTI's clients contacted her and sent e-mails stating that they had not been solicited, she accepted their business.

Fine's client base at Allscope primarily consisted of former CTI clients. Allscope sent the former CTI clients holiday gifts, and Fine invited them to attend a brunch at her house.

CTI's executives subsequently noticed that some of their major clients were no longer responding to their calls and requests for meetings. When CTI's executives attempted to schedule meetings with certain clients, they were informed that the clients were going to be doing business with Fine at Allscope. CTI's executives also noticed that some of their client files had been wiped out of the system and updated client contact information was missing. CTI received information that Fine had been contacting its clients and vendors on behalf of Allscope and had been making disparaging remarks about CTI to others. CTI lost client accounts that it had previously been servicing for 13 years.

CTI filed suit and obtained a temporary restraining order that prohibited Fine from taking any actions that would violate the restrictive covenants. CTI also sent a letter to certain of its valued clients and publication vendors that informed them of the lawsuit and temporary restraining order. In the letter, CTI expressed an intent to protect its client relationships and requested that its clients report any communications from Fine and Allscope which urged the termination of the relationship with CTI or gave any negative information about CTI.

Based upon CTI's letter, Fine and Allscope filed a counterclaim in the lawsuit, alleging claims of defamation, libel, and slander per se. Contending that CTI's letter had caused them to lose a project from one of CTI's former clients, Fine and Allscope sought compensatory damages, punitive damages, attorney fees, and expenses of litigation.

The parties filed motions for summary judgment as to the claims

and counterclaims in the suit. The trial court granted summary judgment in favor of CTI as to the counterclaim. The trial court granted summary judgment in favor of Fine and Allscope as to CTI's claims. These appeals ensued.

### Case No. A10A0408

1. Fine and Allscope contend that the trial court erred in granting CTI's motion for summary judgment as to their claims for defamation and libel.[4] We discern no error.

(a) Fine and Allscope argue that the trial court's determination of the motion for summary judgment was premature since the parties had not completed discovery.[5] Their counsel filed an affidavit under OCGA § 9-11-56 (f),[6] contending that further discovery from third parties was needed to address the claims in CTI's motion.

"The granting or denial of a motion under OCGA § 9-11-56 (f) lies in the sound discretion of the trial judge and will not be reversed absent a showing of clear abuse of discretion." (Citation omitted.) *Jarallah v. Schoen*, 243 Ga. App. 402, 406 (4) (531 SE2d 778) (2000). See also *Calcutta Apts. Assoc. v. Linden & Deutsch*, 131 Ga. App. 743, 744-745 (1) (206 SE2d 559) (1974). No abuse of the trial court's discretion has been shown here. CTI filed its motion for summary judgment on December 15, 2006. Counsel for Fine and Allscope filed his request and affidavit under OCGA § 9-11-56 (f) on January 26, 2007. The trial court conducted a hearing and entered its order granting the summary judgment motion in May 2009. As such, over two years elapsed before the entry of the trial court's order, which provided ample time for the parties to diligently conduct further discovery. Under these circumstances, the trial court's failure to grant the request for additional time to file counter-affidavits was not erroneous. See *Patterson v. Lanham*, 182 Ga. App. 343, 344 (1) (355 SE2d 738) (1987); *Shmunes v. Gen. Motors Corp.*, 146 Ga. App. 486 (1) (246 SE2d 486) (1978). See also *Lee v. Dept. of Natural*

*YALE LAW LIBRARY*

---

[4] Fine and Allscope also contend that the trial court erred in granting summary judgment as to their slander claim. But, because their appellate brief fails to contain any argument or citation of authority supporting that claim, it has been abandoned under Court of Appeals Rule 25 (c) (2). See *Fleming v. Advanced Stores Co.*, 301 Ga. App. 734, 735-736 (688 SE2d 414) (2009); *Guilford v. Marriott Intl.*, 296 Ga. App. 503, 504-505 (675 SE2d 247) (2009).

[5] Although Fine and Allscope argue that further discovery was needed to resolve the claims in the case, they filed a motion for summary judgment on November 12, 2008.

[6] According to OCGA § 9-11-56 (f),
[if] it appear[s] from the affidavits of a party opposing the motion that he cannot, for reasons stated, present by affidavits facts essential to justify his opposition, the court may refuse the application for judgment, or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had, or may make such other order as is just.

*Resources*, 263 Ga. App. 491, 495 (4) (588 SE2d 260) (2003) (affirming the trial court's finding that "[appellant] had not shown the diligence necessary to take advantage of OCGA § 9-11-56 (f)") (punctuation omitted).

(b) Fine and Allscope further contend that the trial court's decision granting CTI's motion for summary judgment was erroneous because the evidence created a genuine issue as to whether CTI's letter to the clients and vendors was libelous. Again, no error has been shown. Because the evidence established that CTI's letter was privileged as a matter of law, Fine and Allscope could not prevail on this claim.

"A libel is a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." OCGA § 51-5-1 (a). "Statements made with a good faith intent on the part of the speaker to protect his or her interest in a matter in which it is concerned" are deemed privileged. OCGA § 51-5-7 (3). "To make the defense of privilege complete, . . . good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons must all appear." (Citation, punctuation and footnote omitted.) *Rabun v. McCoy*, 273 Ga. App. 311, 316 (2) (615 SE2d 131) (2005).

The libel claims alleged in this case were based upon a letter that CTI sent to its clients on February 2, 2005 and to its publication vendors on February 3, 2005. The letter was sent after the trial court had issued a restraining order prohibiting Fine from violating the terms of the restrictive covenants. The letter expressed that its purpose was "to keep [the client] informed as to the steps [CTI] ha[d] been forced to take to protect [its] [c]ompany from misinformation and the unlawful solicitation of . . . [its] valued client[ ] by [CTI's] former employee, [Fine], and her current employee, [Allscope]." The letter further advised that the trial court had issued a restraining order against Fine and Allscope and substantially quoted the provisions of the temporary restraining order that protected CTI's interests against any solicitations and disclosures that violated the restrictive covenants. It went on to state that CTI "immensely value[d] its relationships with its clients and would protect those relationships," which had been "built on more than three decades of success[.]" The letter then ended in a request that the client report any contacts by Fine and Allscope which urged them to terminate their relationship with CTI or which expressed any negative information about CTI.

CTI's president testified at his deposition that the letter was only sent to certain of its valued clients and that he did not contact clients whose business relationships were not at risk. He further

stated that his intent in sending the letter was to inform CTI's clients about the business situation and the restraining order. He stated that it also was necessary to inform CTI's publication vendors about the situation since some of their rate cards related to exclusive pricing, which CTI deemed to be confidential and subject to the nondisclosure covenant.

Based upon the testimony of CTI's president, the trial court was authorized to find that the letter was sent in good faith. Moreover, it is undisputed that CTI's business relationships with its clients and vendors was an interest to be upheld. And, because the letter only advised clients about the issuance of the temporary restraining order and the prohibition against violations of the restrictive covenants, it was properly limited in its scope. In light of the pending litigation and issuance of the temporary restraining order, the letter also was issued on a proper occasion. Furthermore, the letter was published to proper persons, having been sent only to certain executives of the cable networks and publication vendors who had a business relationship with CTI before Fine left to work for Allscope.[7] The evidence therefore established as a matter of law that CTI's letter was protected by the good faith privilege. See *Nelson v. Glynn-Brunswick Hosp. Auth.*, 257 Ga. App. 571, 574-575 (1) (571 SE2d 557) (2002) (affirming the grant of summary judgment in favor of the defendant hospital as to a libel claim since the hospital's letter was protected by the good faith privilege and was written to protect the hospital's corporate interests); *Willis v. United Family Life Ins.*, 226 Ga. App. 661, 664-665 (1) (b) (487 SE2d 376) (1997) (affirming the dismissal of a libel action since it was apparent from the allegations of the complaint that the defendant's letters to its policyholders were privileged and were sent to protect its policyholders from having their premiums wrongfully diverted and misappropriated); *Speedway Grading Corp. v. Gardner*, 206 Ga. App. 439, 442-443 (2) (425 SE2d 676) (1992) (affirming the grant of summary judgment in favor of the defendant as to a libel claim since the evidence showed that the defendant's statements were made to protect his interests in a dispute regarding a permit application and were privileged).

Fine and Allscope argue, however, that there was evidence indicating that CTI had sent the letter with a malicious intent to injure their business reputations. "Proof that the defendant acted with actual malice in making the statement . . . defeats the defense

---

[7] CTI's president testified that an executive of one of its major clients had previously advised that it was moving all of its business to Allscope, and thus, he was not sure whether that company was still a client at the time that the letter was sent. He also testified that CTI may have had outstanding projects with that client. Regardless, it is undisputed that CTI had maintained a business relationship with the client prior to Fine's departure.

of privilege." *Rabun*, 273 Ga. App. at 316 (2). "[I]f the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted, the party defamed shall have a right of action." OCGA § 51-5-9. "Malice to avoid qualified privilege must be actual and with evil intent." (Citation and punctuation omitted.) *Rabun*, 273 Ga. App. at 320 (2). To prove actual malice, Fine and Allscope were required to show that CTI knew that the statements in its letter were false or published the statements with reckless disregard of the truth. See *Smith v. Henry*, 276 Ga. App. 831, 833 (1) (625 SE2d 93) (2005); *Rabun*, 273 Ga. App. at 316 (2). "[U]nsupported inferences or conjecture regarding a defendant's motivation do not suffice to show malice." (Punctuation and footnote omitted.) *Smith*, 276 Ga. App. at 833 (1). Rather, "[t]he evidence must show in a clear and convincing manner that a defendant in fact entertained serious doubts as to the truth of his statements." (Citations and punctuation omitted.) *Davis v. Shavers*, 225 Ga. App. 497, 501 (3) (484 SE2d 243) (1997).

In support of their claim, Fine and Allscope contend that CTI's letter intentionally misrepresented the terms of the temporary restraining order by failing to disclose that the trial court had not ruled upon the merits of the lawsuit, that the restraining order had been entered simply to preserve the status quo pending further proceedings, and that the restraining order had also described certain activity that was not prohibited. We are unpersuaded. The letter substantially set forth the terms of the restraining order that protected CTI's interests; its failure to include more information or the omission of the additional details regarding the issuance of the restraining order did not establish a claim for libel. See *McDonald v. Few*, 270 Ga. App. 671, 672 (1) (607 SE2d 265) (2004).

Fine and Allscope further argue that CTI's statements accusing them of spreading misinformation and unlawfully soliciting CTI's clients were not true and that CTI's president had acknowledged in his deposition that he did not have any evidence supporting his accusations. But, the testimony from CTI's president indicating that he did not have any legal "evidence" of the alleged unlawful solicitations did not show that CTI knew that the statements in its letter were false. CTI's president and CEO both stated that they had reason to suspect that unlawful solicitations had occurred when they had received information that Fine had been contacting CTI's former clients and the former clients began doing business with Allscope immediately after Fine started working there. Other deposition testimony and copies of e-mails exchanged between Fine, Allscope's CEO, and CTI's former clients presented conflicting evidence as to whether Fine had made disparaging remarks about CTI and had solicited CTI's former clients. The fact that CTI, Fine

and Allscope had a dispute as to whether the restrictive covenants were valid and had been violated was not sufficient to show that CTI acted with malice. See, e.g., *Smith*, 276 Ga. App. at 833 (1).

"[W]hether a showing of actual malice has been made [is an] issue[ ] to be determined by the trial judge in the first instance, and thus [is] particularly appropriate for summary resolution." (Citations and punctuation omitted.) *Rabun*, 273 Ga. App. at 320 (2). Because Fine and Allscope failed to show that CTI acted with malice, the trial court's grant of summary judgment to CTI was proper on the basis of privilege. See *Smith*, 276 Ga. App. at 833 (1); *Kenney v. Gilmore*, 195 Ga. App. 407, 409 (2) (393 SE2d 472) (1990).

2. Fine and Allscope also contend that the trial court erred in granting summary judgment in favor of CTI on their claims for punitive damages and attorney fees. Their contentions are without merit. Because Fine and Allscope failed to prevail on their underlying defamation claims, their ancillary claims for punitive damages and attorney fees under OCGA § 13-6-11 were not recoverable. See *Davis v. Johnson*, 280 Ga. App. 318, 322 (634 SE2d 108) (2006); *Gardner v. Kinney*, 230 Ga. App. 771, 772-773 (498 SE2d 312) (1998); *Mayfield v. Ideal Enterprises*, 157 Ga. App. 266, 267 (1) (277 SE2d 62) (1981).

### Case No. A10A0409

3. CTI contends that the trial court erred in finding that the nonsolicitation covenant was unenforceable. We disagree.

> While a contract in general restraint of trade or which tends to lessen competition is against public policy and is void (1983 Ga. Const., Art. III, Sec. VI, Par. V (c); OCGA § 13-8-2), a restrictive covenant contained in an employment contract is considered to be in partial restraint of trade and will be upheld if the restraint imposed is not unreasonable, is founded on a valuable consideration, and is reasonably necessary to protect the interest of the party in whose favor it is imposed, and does not unduly prejudice the interests of the public. Whether the restraint imposed by the employment contract is reasonable is a question of law for determination by the court, which considers the nature and extent of the trade or business, the situation of the parties, and all the other circumstances.

(Citations and punctuation omitted.) *W. R. Grace & Co. v. Mouyal*,

262 Ga. 464, 465 (1) (422 SE2d 529) (1992).[8] "Georgia courts have traditionally applied close scrutiny to employment contracts containing restrictive covenants and have upheld them only when the covenant is strictly limited in time, territorial effect, and activities prohibited." *Palmer & Cay of Ga. v. Lockton Cos.*, 284 Ga. App. 196, 198 (643 SE2d 746) (2007). Whether a restrictive covenant is enforceable is a question of law, and we review the trial court's ruling de novo. Id. at 197.

The nonsolicitation covenant in this case provided, in pertinent part, as follows:

> 4. *Nonsolicitation of Clients.* The Employee hereby also agrees and covenants with [CTI] that throughout the period of his employment and for a period of two (2) years immediately following cessation of Employee's employment with [CTI], the Employee shall not solicit advertising media placement business similar to [CTI] on behalf of any persons or entity other than [CTI], either directly or indirectly, whether as a shareholder, partner, joint venturer, consultant, employee, officer, agent or otherwise, from any person or entity (*or otherwise contact, call upon, communicate with or attempt to communicate with any such person or entity with a view to providing advertising media placement services* competitive or potentially competitive with [CTI]).

(Emphasis supplied.) Based upon the above-emphasized terms of the parenthetical, the trial court held that the restrictive covenant was an overbroad, unreasonable restraint of trade since it not only prohibited Fine from soliciting CTI's clients, but also prohibited her from "otherwise" communicating with the former clients to accept business, without solicitation and regardless of who initiated the contact. We agree.

"While a prohibition involving some affirmative act on the part of the former employee, such as solicitation, diversion, or contact of clients, may be reasonable, a covenant prohibiting a former employee from merely accepting business, without any solicitation, is not reasonable." (Footnotes and emphasis omitted.) *Waldeck v. Curtis 1000, Inc.*, 261 Ga. App. 590, 592 (583 SE2d 266) (2003). See also

---

[8] The Georgia legislature has recently enacted OCGA § 13-8-56, setting forth principles that are intended to prospectively govern the determinations of reasonableness of restrictive covenants. See Ga. L. 2009, p. 231. However, the statute will only become effective if an amendment to the Georgia Constitution passes voter approval in the 2010 general election. See Ga. L. 2009, p. 231, § 4. The statute has not yet become effective and does not apply in this case.

*Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 377 (1) (297 SE2d 473) (1982) (holding that a restrictive covenant was unreasonable and overprotective since it would prohibit the employee from accepting employment from a former client who approached him for services, without any prior solicitation on his part); *Akron Pest Control v. Radar Exterminating Co.*, 216 Ga. App. 495, 497 (1) (455 SE2d 601) (1995) (ruling that solicitation requires some affirmative action on the employee's part; the employee's mere acceptance of business did not in any sense constitute solicitation in violation of the restrictive covenant). Because the provisions of CTI's nonsolicitation covenant also prohibited Fine from merely accepting business without solicitation, the covenant was not reasonably limited in its scope of the activities prohibited. See id.[9] As such, the nonsolicitation covenant was void and unenforceable.

4. In addition, CTI contends that the trial court erred in finding that the nondisclosure covenant was void based upon the unenforceability of the nonsolicitation covenant. Pretermitting whether the trial court erred in its finding or whether the nondisclosure covenant was valid,[10] the trial court's entry of summary judgment was authorized.

CTI's claim alleged that Fine had breached the nondisclosure covenant by disclosing CTI's confidential client information and trade secrets in her revenue projections to Allscope. The evidence of record, however, does not support CTI's claim. Fine testified that although her revenue projections to Allscope were partly based upon her knowledge of the billing histories and media buys of CTI's clients, the projections that she provided to Allscope were general and did not disclose any of CTI's actual billing amounts or confidential information. The spreadsheet of revenue projections that Fine and Allscope developed did not name any of CTI's clients, and there is no evidence establishing that the monetary figures contained in the spreadsheet were consistent with any of the billing history amounts of CTI's clients. Because there is no evidence that Fine disclosed any of CTI's confidential client information and trade

---

[9] Contrary to CTI's argument, the nonsolicitation covenant in this case was not substantially similar to those upheld in *W. R. Grace & Co.*, 262 Ga. at 464, and *Covington v. D.L. Pimper Group*, 248 Ga. App. 265, 268-269 (2) (546 SE2d 37) (2001), since its restriction also extended to prohibit Fine from "otherwise" contacting and communicating with former clients to accept business, without her prior solicitation.

[10] See *Sunstates Refrigerated Svcs. v. Griffin*, 215 Ga. App. 61, 62 (2) (449 SE2d 858) (1994) (ruling that specific noncompetition prohibitions concerning customer solicitation must be analyzed separately from prohibitions concerning disclosure of confidential business information and "Georgia's rejection of the 'blue pencil theory of severability' does not require invalidation of the provisions concerning . . . disclosure of confidential business information."). See also *Sanford v. RDA Consultants*, 244 Ga. App. 308, 311-312 (1), (3) (535 SE2d 321) (2000).

secrets as alleged, the trial court's entry of summary judgment as to CTI's claim for breach of the nondisclosure covenant was authorized.

5. CTI further claims that the trial court erred in granting summary judgment in favor of Allscope on the claim for tortious interference with Fine and the restrictive covenants.

> In establishing a cause of action for malicious or tortious interference with business relations, the appellants must demonstrate that the appellee (1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the appellants, and (4) for which the appellants suffered some financial injury. A cause of action for intentional interference with contractual rights must be based on the intentional and non-privileged interference by a third party with existing contractual rights and relations.

(Footnote and emphasis omitted.) *Tom's Amusement Co. v. Total Vending Svcs.*, 243 Ga. App. 294, 295 (2) (533 SE2d 413) (2000). Here, CTI bases its claims for tortious interference upon Allscope's alleged interference with the enforcement of the restrictive covenants. But because the nonsolicitation covenant was void, as explained in Division 3 above, Allscope could not be held liable for interfering with its enforcement. See *Wachovia Ins. Svcs. v. Fallon*, 299 Ga. App. 440, 449 (5) (a) (682 SE2d 657) (2009).

CTI further claims that Allscope engaged in tortious interference with the enforcement of the nondisclosure covenant by inducing Fine to disclose CTI's confidential client billing histories in her revenue projections. "In Georgia, a competitor's privilege of fair competition is lost when wrongful means in the solicitation of employees are utilized. Such wrongful means generally involve predatory tactics such as . . . use of confidential information[.]" (Citation, punctuation and footnote omitted.) *Tom's Amusement Co.*, 243 Ga. App. at 297 (2) (b). Malice supporting a claim for tortious interference may be shown by evidence that the defendant persuaded someone to break a contract for the defendant's benefit and at the expense of another. See *White v. Shamrock Bldg. Systems*, 294 Ga. App. 340, 344-345 (1) (669 SE2d 168) (2008).

Before making an offer of employment to Fine, Allscope's CEO asked Fine to prepare a projection of revenues that she could generate upon joining the Allscope team. Allscope's CEO, however, did not request that Fine's projections be based upon CTI's clients. Although Fine testified that she relied, in part, upon the billing histories of CTI's clients in preparing her projections, there was no

evidence that Allscope requested that she do so.[11] Because there is no evidence that Allscope took any action to persuade or urge Fine to disclose any of CTI's confidential billing histories, the trial court's entry of summary judgment against CTI was authorized. See *White*, 294 Ga. App. at 344-345 (1).

6. Lastly, CTI contends that summary judgment was erroneously granted as to its claim against Fine for breach of a duty of loyalty.

While employed as a vice president at CTI, Fine had authority to act as CTI's agent and, in fact, was the primary contact for CTI's major clients. As CTI's agent, Fine owed a fiduciary duty to use her best skill and judgment to promote CTI's interests during the term of her employment. See *Hanson Staple Co. v. Eckelberry*, 297 Ga. App. 356, 358 (1) (677 SE2d 321) (2009); *Lane Co. v. Taylor*, 174 Ga. App. 356, 362 (5) (330 SE2d 112) (1985).

A breach of this fiduciary duty is not occasioned simply by making plans to enter a competing business while still employed. See *Hanson Staple Co.*, 297 Ga. App. at 358-359 (1). But, an employee cannot engage in acts in direct competition with the employer's business before the employment relationship ends. See id. at 359 (1).

Fine's employment with CTI ended on November 15, 2005. There is no evidence that Fine solicited any of CTI's clients while still employed at CTI. Rather, CTI contends that Fine breached her duty of loyalty by making detailed disclosures to Allscope regarding the revenue generated by various CTI clients, by failing to provide adequate notice prior to her leaving, and by deleting client contact information and destroying CTI's files that had been in her possession.

(a) As explained in Division 4 above, the record does not reflect that Fine made any detailed disclosures of the revenue amounts generated by CTI's clients. CTI's claim in this regard, therefore, fails.

(b) Nor is there any evidence that Fine breached a duty of loyalty by resigning with short notice. CTI's reliance upon *Witty v. McNeal Agency*, 239 Ga. App. 554, 557-559 (2) (a), (b) (521 SE2d 619) (1999), in support of its claim is misplaced. In *Witty*, this court upheld the validity of a notice provision in an employment contract that required the employee to serve written notice of his resignation two weeks prior to terminating his employment relationship. See id. The time limitation in the employment contract was intended to afford the employer sufficient time to contact its clients before the employee began to work and solicit clients on behalf of a competitor. Id.

---

[11] Moreover, as explained in Division 4 above, there is no evidence that Fine disclosed any details regarding the billing histories of CTI's clients in her projections.

at 554, 558 (2) (a). In the instant case, however, CTI has not presented any evidence that Fine was under a contractual obligation imposing a time limitation for giving notice of her resignation. As such, unlike in *Witty*, there is no evidence that Fine had a duty to comply with a notice requirement.[12]

(c) CTI also contends that Fine breached her duty of loyalty by deleting its client contact information and destroying its client files prior to her departure, which caused it to lose crucial information regarding its major clients and weakened its position against the Allscope competitor.

Although there was no direct evidence supporting CTI's allegations of misconduct, CTI presented circumstantial evidence from which an inference of the alleged misconduct could be drawn. CTI's executives testified that before Fine left her employment with CTI, her office had been full of boxes containing CTI's client files, her computer contained an e-mail list used to correspond with the clients, and her company Blackberry cell phone had been loaded with client contact information. After Fine left, however, CTI's executives noticed that some of its client files had been wiped out of the system, documents had been removed from the client files that were in Fine's office, the e-mail list had been deleted from Fine's computer, and the client contact information had been deleted from her Blackberry. Based upon these circumstances, and evidence that the files and information became missing when Fine left, CTI concluded that Fine had committed the acts to deprive CTI of its client information in breach of her duty of loyalty.

Fine, however, denied CTI's allegations. The question thus presented is whether CTI's circumstantial evidence was sufficient to create a jury issue.

> [C]ircumstantial evidence has no probative value in establishing a fact where such evidence is consistent with direct, unimpeached evidence showing the nonexistence of such fact. Put another way, before circumstantial evidence can have any probative value to rebut or contradict direct and positive testimony of an unimpeached witness of the alleged facts in question, such evidence must point at least more strongly to a conclusion opposite to the direct testimony. It is not sufficient that such circumstantial evidence

---

[12] Furthermore, unlike in *Witty*, CTI has not shown that the one-and-a-half week notice provided an inadequate amount of time within which to contact its clients and engage in efforts to preserve its business interests. The evidence shows that Fine tendered her resignation to CTI on November 4, 2005 and her last day of employment was on November 15, 2005. Although CTI had received advance notice of Fine's resignation, it did not take action to contact its clients until November 14, 2005.

YALE LAW LIBRARY

points equally one way or the other. It is also true that for an inference drawn from circumstantial evidence to be sufficient to create a genuine issue of fact precluding summary judgment, it must be reasonable and must amount to more than mere speculation, conjecture, or possibility.

(Citations and punctuation omitted.) *Winder v. Paul Light's Buckhead &c. Plymouth*, 249 Ga. App. 707, 711-712 (3) (549 SE2d 515) (2001).

Applying these principles in this case, we conclude that the circumstantial evidence was sufficient to require a jury's determination of the issue. The circumstantial evidence supporting CTI's claim that Fine had deleted and destroyed its client files was inconsistent with and contradicted Fine's denial of the claim. The circumstantial evidence also showed that Fine had an opportunity and motive to deprive CTI of its client information and pointed at least more strongly to a conclusion that she had done so prior to leaving CTI to join its competitor. Based upon the evidence, the jury could draw reasonable inferences in favor of the claim. Consequently, the trial court erred in granting summary judgment as to this issue. See *Winder*, 249 Ga. App. at 712-713 (3); *Lane Co.*, 174 Ga. App. at 362 (5) (reversing the grant of a defendant's motion for summary judgment and ruling that an agent's primary obligation is loyalty to his principal, and if the agent obtains any advantage out of the relationship which injures his principal, he is liable in damages for violation of the trust owed). See, e.g., *DuCom v. State*, 288 Ga. App. 555, 559-560 (1) (654 SE2d 670) (2007) (agent violated her duty of loyalty by taking the company's master client list from the premises without authority).

*Judgment affirmed in Case No. A10A0408. Judgment affirmed in part and reversed in part in Case No. A10A0409. Senior Appellate Judge G. Alan Blackburn concurs. Barnes, P. J., concurs in judgment only.*

DECIDED JULY 16, 2010 — 

*Richard L. Robbins, Alexa R. Ross*, for appellants.
*Parks, Chesin & Walbert, Allan L. Parks, Jr., Andrew Y. Coffman*, for appellee.