## A10A1883. GORDON DOCUMENT PRODUCTS, INC.
## v. SERVICE TECHNOLOGIES, INC. et al.

(708 SE2d 48)

ADAMS, Judge.

Appellant Gordon Document Products, Inc. (GDP) brought suit against Service Technologies, Inc. (STI), Jeffrey Layne, Rufus Mosley and Floyd Carr, Jr., d/b/a Service Technologies (hereinafter collectively referred to as defendants) asserting claims for tortious interference, breach of fiduciary duty, breach of employment agreements, defamation, libel and slander per se. The trial court granted summary judgment to defendants on all of GDP's claims, and GDP appeals.

GDP and STI are competitors engaged in the business of marketing, installing and servicing business machines and related supplies, equipment and merchandise. Layne and Mosley are former GDP employees who left GDP and began working for STI on March 17, 2008, several days after they resigned from GDP. While they were employed at GDP, both Mosley and Layne executed employment agreements which contained noncompete restrictive covenants, and the alleged violation of these covenants is the basis of Count 2 of GDP's complaint.[1] GDP also asserted a claim for tortious interference with contractual relations against STI, alleging that it induced Layne and Mosley to breach their employment contracts with GDP. Additionally, GDP alleged that Layne breached his fiduciary duties to GDP by soliciting employees to leave their employment with GDP to work at STI and that STI aided and abetted Layne in this breach. GDP also asserted separate claims for tortious interference with business relations and employment relations, alleging that Layne, individually or on behalf of or in conjunction with STI, induced certain employees to terminate their employment with GDP and used confidential information in order to solicit customers and employees of GDP. Lastly, GDP asserted defamation, libel and slander claims against Layne.

1. We will first address GDP's fifth enumeration of error, which challenges the grant of summary judgment on its claims for breach of employment agreements.

(a) *Mosley Agreement.* Mosley began working at GDP as a sales representative in August 2003; during his employment with GDP he executed a sales representative employment agreement which contained a noncompete restrictive covenant. Section (5) (c) of the

---

[1] Additionally, GDP alleged that Layne breached GDP's conflict of interest policy and procedures, and the trial court granted summary judgment on this claim on the basis, inter alia, that GDP did not respond, either in writing or at the hearing, to Layne's motion for summary judgment on this count. GDP does not enumerate this ruling as error.

agreement provides in relevant part that

> for a period of two (2) years after termination of employ-
> ment in the Territory, whether such termination is at the
> instance of the Company or Employee, Employee will not
> directly or indirectly, on Employee's own behalf or for
> others, demonstrate or sell in the Territory any products or
> services that are competitive with the Products [carried by
> the company]; . . .

"Territory" is defined in the agreement as "the geographical area
served by the Company, such area consisting of the following Map(s)
and/or Description(s) in the state of Georgia: See Exhibit 'A', pages
1 and 2 attached." A map of Georgia with 31 counties highlighted is
attached as Exhibit A to the agreement; there is no page 2 to Exhibit
A. Further, the agreement defines "Products" as

> the following product lines, and related supplies and ser-
> vices, carried by the Company: Copiers, fax machines,
> printers, color systems and multifunction (copy, fax, print)
> devices, duplicators, services and supplies related to the
> foregoing products, and document management hardware
> and software.

(b) *Layne Agreement.* Layne began working for GDP as a "color"
specialist or manager, assisting sales representatives with color sales,
in August 2004.[2] A little over three years later on October 22, 2007,
he executed a Gordon Document Products Sales Manager Employ-
ment Agreement containing a noncompete restrictive covenant. In
pertinent part the agreement provided: "for a period of two (2) years
after termination of employment in the Territory, . . . Employee will
not directly or indirectly, on Employee's own behalf or for others,
demonstrate or sell in the Territory any products or services that are
competitive with the Products [carried by the Company]; . . ." The
definition of products contained in the Layne agreement was sub-
stantially similar to that contained in the Mosley agreement. Layne's
agreement defined "Territory" to "mean the geographical area
served by the Employee, such area consisting of the following Map(s)
and/or Descriptions in the state of Georgia: as shown on Exhibit 'A'."
Two pages are attached to the agreements as Exhibit A. Page 1 of the
exhibit shows a map with shaded counties and the following text:
DeKalb, Fulton, Newton and Rockdale counties as described on

---

[2] It appears that Layne was a specialist in the area of color copiers, and that his primary
role at GDP was to educate and support other sales representatives in that area.

Exhibit "A" Page "2" and the notation "The entire counties." Page 2 of the exhibit contains a list of thirty-one counties, including the four listed on page 1, but no description of those counties. And page 2 of the exhibit includes Madison County, but Madison County is not shaded on page 1; however, Oconee County is shaded on page 1, but is not listed on page 2 and it is unclear whether Greene County may be partially shaded on page 1 — it is not listed on page 2.

GDP produced documents labeled GDP sales list in response to defendants' discovery requests to identify the areas where Layne and Mosley were involved in sales on behalf of GDP. The trial court concluded from this evidence[3] that Layne and Mosley were not involved in sales in many of the counties restricted by their respective agreements, and that the noncompete covenants were thus overly broad and unenforceable.[4]

Because the covenants in this case arise out of employment agreements, they are subject to strict scrutiny. *Dent Wizard Intl. Corp. v. Brown*, 272 Ga. App. 553, 555 (1) (612 SE2d 873) (2005).

> Courts will enforce a restrictive covenant in an employment contract only if: "(1) the restraint is reasonable; (2) founded upon valuable consideration; (3) is reasonably necessary to protect the party in whose favor it is imposed; and (4) does not unduly prejudice the interests of the public." (Citation omitted.) *Hostetler v. Answerthink, Inc.*, 267 Ga. App. 325, 328 (a) (599 SE2d 271) (2004). Moreover, "(s)uch restriction must be strictly limited as to time, territorial effect, capacity in which the employee is prohibited from competing, and as to overall reasonableness." (Citation omitted.) Id. "Whether the restraint imposed by the employment contract is reasonable is a question of law for determination by the court, which considers the nature and extent of the trade or business, the situation of the parties, and all other circumstances." (Punctuation and footnote omitted.) *Habif,*

---

[3] These documents indicate that Mosley was involved in sales in only ten or eleven counties between 2006-2008 and that Layne was involved in sales in twenty-four counties (or less) between 2005 and 2008.

[4] The trial court also found the agreements were overbroad as to scope and were indefinite, either of which would also be fatal to the enforcement of the agreements. However, we find it unnecessary to consider whether the trial court correctly ruled on these provisions, since the "blue pencil theory of severability" is not applicable here, and "[t]herefore, if any of the sub-paragraphs of the restrictive covenant are invalid, the entire covenant must fall." (Citation and punctuation omitted.) *Rollins Protective Svcs. Co. v. Palermo*, 249 Ga. 138, 141 (1) (287 SE2d 546) (1982).

*Arogeti & Wynne v. Baggett*, 231 Ga. App. [289, 292 (2) (498 SE2d 346) (1998)].

Id. at 555-556 (1). *Coleman v. Retina Consultants*, 286 Ga. 317, 320 (1) (687 SE2d 457) (2009).[5]

Turning to the territorial restrictions at issue here, it appears that these two employees participated in sales activities[6] in some of the counties which were listed in their respective employee agreements, but that their lists also included counties where GDP may have done business but these employees did not. On appeal, GDP does not contend that the employees made actual sales in all the included territories, but argues that

> the restricted territory outlined in the covenants is sufficiently limited under Georgia law because it only consists of a discrete portion of North Georgia and is limited to *GDP's sales territory*. The employment agreements only included areas where *GDP* sold products on a consistent basis.

As we have previously explained:

> While this Court will accept as prima facie valid a territory where the employee worked and the employer does business, a territory that is only where the employer does business but the employee did not work is overly broad on its face, absent strong justification for such protection, other than the desire not to compete with the former employee. *Hulcher Svcs v. R. J. Corman R. Co.*, 247 Ga. App. 486, 491 (4) (543 SE2d 461) (2000).

*Dent Wizard Intl. Corp. v. Brown*, 272 Ga. App. at 556 (1). E.g., *W. R. Grace &c. v. Mouyal*, 262 Ga. 464, 466 (422 SE2d 529) (1992); *Rollins Protective Svcs. Co. v. Palermo*, 249 Ga. 138, 139 (1) (287 SE2d 546) (1982).

In this case, GDP has offered no specific business justification for including these other counties, other than the assertion that the employees "were responsible for undertaking efforts to sell the

---

[5] Our analysis in this case is unaffected by any recent legislative proposals or changes. See OCGA § 13-8-2.1 (a) and applicability date contained in Ga. L. 2009, p. 231, § 4; *Cox v. Altus Healthcare & Hospice*, 308 Ga. App. 28 (706 SE2d 660) (2011).

[6] Layne testified that he was not a sales representative and thus was not bound to any territory and that he believed that John Gordon, the president of GDP, simply highlighted the areas where the company sold.

products listed in these territories," and pointing to the fact that they were responsible for "cold calling" or otherwise developing business from potential customers in the area where GDP did business. First, we note that GDP does not assert that the two employees actually "undertook efforts" to sell products in these territories, but merely that they "were responsible" for such efforts. And even if this allegation had specific support in the record, GDP does not point to any specific potential customers that the employees may have "called on" but not made sales to, or to any "potential" customer list that they may have "worked" or cultivated. In essence, to read this provision as GDP suggests, a customer who specifically rejected the employees' efforts, and who indeed may have been receiving services from a competitor, could be included in this calculation. This clearly would be overbroad and unreasonable. Based on the foregoing, we find no error in the trial court's grant of summary judgment on Count 2 of the second amended complaint.

2. Turning now to GDP's first and second enumerations of error, GDP contends that the trial court erred in granting summary judgment to Layne and STI on GDP's claims for tortious interference with employee relations and tortious interference with business relations.

> Tortious interference claims, whether asserting interference with contractual relations, business relations, or potential business relations, share certain common essential elements: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

(Citation omitted.) *Kirkland v. Tamplin*, 285 Ga. App. 241, 243 (1) (645 SE2d 653) (2007). *Sommers Co. v. Moore*, 275 Ga. App. 604, 605 (621 SE2d 789) (2005).

In this context, "improper conduct means wrongful action that generally involves predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." (Punctuation omitted.) *Disaster Svcs. v. ERC Partnership*, 228 Ga. App. 739, 741-742 (492 SE2d 526) (1997). *American Bldgs. Co. v. Pascoe Bldg. Systems*, 260 Ga. 346, 348-349 (2) (392 SE2d 860) (1990); *Kirkland*, 285 Ga. App. at 244 (1); *Sommers*, 275 Ga. App. at 606.

GDP contends the trial court erred in granting summary judgment on these claims because the evidence showed that Layne and STI tortiously procured the defection of former GDP employees Mosley, William Griswell, and Kelly Edge and tried to drive GDP out of business. Although GDP did not point to any specific evidence in its initial brief on appeal, referring generally to its statement of material facts, it appears to rely primarily on the following incidents and facts to support this claim: an after work meeting that several GDP employees attended in November or December 2007, a "tour" of STI which several GDP employees attended in early March 2008 and the testimony of two GDP employees concerning Layne's alleged solicitation of employees.

As is pertinent to these claims, the record shows the following: In November or December 2007, a group of GDP employees went to a bar after work. Craig Rizk, a former GDP employee who is not a party to this litigation, testified in his deposition that he asked Layne and others to attend and that Layne, Andrew Daly, Kelly Edge, Marty Calkins, Jeremy Chick and one or two others attended. Rizk prepared a document with "bullet" points for conversation about dissatisfaction with the company, and it was disseminated at the meeting. The general tone of the meeting was dissatisfaction with the company and a possible walkout if demands were not met, but nothing came of that "plan."

Several months after the meeting, in late January 2008, Layne first contacted STI by calling its president Lee Carr, for whom he had previously worked. Over the course of the next six or seven weeks, Layne and Carr exchanged phone calls and e-mails and met at either STI or public venues to discuss, among other things, Layne's potential employment with STI.

Layne accepted employment with STI and signed an employment contract on or about March 12 or 13, 2008; he gave notice to GDP on or about March 14, and started working at STI on March 17.

Layne testified that "right before" he made his decision to leave GDP he told Chick, Daly, Mosley and Edge that he was leaving because he "just . . . couldn't . . . do this anymore." Layne testified that these four were also his friends and that he believed they had probably begun looking for other employment even before he did.

The evidence also showed that Mosley, Chick and Daly made a tour of the facilities at STI in early March 2008, and GDP presented evidence that Layne made remarks encouraging the others to come to work there. Mosley, who was the only GDP employee on the tour who subsequently came to work at STI, testified that at that point "everybody" in the office was looking for a job and he was looking for an opportunity to leave GDP, a decision he had made months before following several incidents in which he felt he had been treated

unfairly.

In addition to Mosley, Edge also left GDP and started working at STI. Edge testified that he visited STI with Daly while they were out at lunch one day, but that he was not part of the "group" tour. Edge testified that he did not find out where Layne was going until right around his departure from GDP and that he had not heard of STI before then. He further testified that Layne explained to him the differences between how GDP and STI operated, but that Layne did not tell him he wanted him to come to work at STI, although he knew he was the type of sales representative that Layne would want to employ.

In June 2008, Bill Griswell, a long-time service technician at GDP, left GDP and went to work at STI. Both Layne and Griswell testified that Griswell contacted Layne at STI on his own initiative after he had a conversation with some former GDP technicians who worked for another company, not STI. Griswell further testified that although he had worked for GDP for many years and had a good relationship with GDP's president, John Gordon, he decided to look elsewhere after he was told in a performance review conducted in the summer of 2007 that he had gone as far as he could go as a technician with the company, and should consider going into IT. But GDP did not offer him any training for that position and by the end of the year he was considering looking elsewhere. He further testified that he never told Layne he was dissatisfied at GDP or that he wanted to change jobs before Layne left GDP and that Layne never mentioned to him that he should come to work at STI. Griswell testified that although Layne told him he was going to work at STI before he left, he could not remember Layne telling him why or that he was upset at the way things were at GDP or with Gordon. He also testified that he toured STI before he went to work there, but it was with one of the people he was interviewing with, not Layne. Mosley, Edge and Griswell all testified that their compensation at STI was either comparable or less than what they received at GDP.

Lastly, although several employees of GDP testified that they thought employees left GDP and went to STI because Layne solicited them by making disparaging statements about GDP and Gordon, the portions of their statements that were based on hearsay or were speculative were struck by the trial court, and GDP has not challenged that ruling. Moreover, the meeting in late 2007 cannot form the basis for GDP's claims since that meeting occurred before Layne contacted Carr at STI about coming to work there. And, as to the March tour of STI, the only employee who attended the tour of STI who came to work there was Mosley, and he testified that he had made up his mind to leave GDP months before that and was just looking for the right opportunity. Moreover, Griswell contacted STI

because of former employees of GDP who did not work at STI and not because of anything Layne said or did, and Edge also initiated the contact with Layne and STI and had made up his mind to seek other opportunities prior to Layne leaving GDP. To summarize, it appears that there was prevalent employee dissatisfaction at GDP and that Layne reaching out and procuring employment with this former boss merely provided the opportunity that others had already been seeking. But even then only two other salespersons left to go to work at STI (others did leave GDP, but did not join STI), and the third employee, a technician, was not a part of this dissatisfied group and decided to leave GDP only because he had been individually told that he had no prospects for advancement in his current position there. Thus, as the trial court found, there was no evidence that Layne acted improperly to induce GDP employees to leave and come to work at STI. And, even if he did, there is no evidence that STI acted in such a way so as to defeat the protection of the privilege of fair competition. *Gresham & Assoc. v. Strianese*, 265 Ga. App. 559, 562-563 (2) (595 SE2d 82) (2004). Likewise, there is no evidence to show that Layne and STI were trying to drive GDP out of business. The trial court properly granted summary judgment to Layne and STI on these claims, and GDP's first two enumerations of error are without merit. *American Bldgs.*, 260 Ga. at 348-349; *Kirkland*, 285 Ga. App. at 244 (1) (a), (b); *Sommers*, 275 Ga. App. at 606-607; *Contractors' Building Supply v. Gwinnett Sash & Door*, 199 Ga. App. 38, 39 (2) (403 SE2d 844) (1991).

3. Because it is somewhat related to the above, we next address GDP's sixth enumeration of error. Citing *Carroll Anesthesia Assoc. v. Anesthecare*, 234 Ga. App. 646, 647-648 (507 SE2d 829) (1998), GDP makes the unparticularized argument that the trial court erred by granting summary judgment on its "claims for tortious interference with employment contracts *and* business relations as they related to customers and employees and defined product sales in the defined territories" because the evidence shows STI knew about and had reviewed GDP's employment agreements, and that the facts, which it did not specify, demonstrated that there remained issues of fact for jury resolution on the essential elements of those claims. First, unlike *Carroll Anesthesia Assoc.*, as we held in Division 1, this case does not involve enforceable employment agreements. Moreover, as STI points out, mere knowledge that an employee has a noncompete agreement is insufficient to create a claim for tortious interference as there must also be evidence to show that STI acted maliciously to induce the breach. *Williams v. Rio Grande Fence Co.*, 221 Ga. 633, 635 (2) (146 SE2d 630) (1996).

Moreover, to the extent that GDP is asserting a claim for wrongful interference with customer relations, the evidence shows

only that three former GDP customers bought products from STI after Layne started working there. GDP did not present any evidence from these customers concerning these purchases and did not present any evidence concerning the circumstances surrounding these sales. See *Pendley Quality Trailer Supply v. B & F Plastics*, 260 Ga. App. 125, 126-127 (578 SE2d 915) (2003) (directed verdict proper when company did not offer testimony from customers as to why they left the company). Moreover, Layne testified that Carr instructed STI employees not to make sales calls or sales attempts to GDP customers "from day one" after he started working there, and Griswell testified that he had not performed any service calls on GDP customers since he left the company. This enumeration thus also presents no basis for reversal.

4. GDP argues that the trial court erred in granting summary judgment on its claim against Layne for breach of fiduciary duty. Again we find no error.

> Fiduciary duties and obligations are owed by those in confidential relationships, i.e., relationships "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc." OCGA § 23-2-58.

*Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 606 (1) (503 SE2d 278) (1998).

Although it is undisputed that Layne was not a GDP principal, officer or director and for that reason many of the cases GDP relies on are unavailing,[7] GDP argues that the trial court erred by finding that Layne did not have the authority to bind GDP.

> An agency relationship arises "wherever one person, expressly or by implication, authorizes another to act for him. . . ." OCGA § 10-6-1. In order for [Layne] to serve as [GDP's] agent, [he] had to be more than the employee delegated by [GDP] to look after certain accounts — [he] had to be "vested with authority, real or ostensible, to create

---

[7] E.g., *Fine v. Communication Trends*, 305 Ga. App. 298, 299 (699 SE2d 623) (2010) (employee was a corporate vice president and the main contact for company major clients); *Gresham & Assoc.*, 265 Ga. App. at 560 (employee was a vice president in charge of a department of the company); *E. D. Lacey Mills, Inc. v. Keith*, 183 Ga. App. 357 (359 SE2d 148) (1987) (employee owned five percent of the stock of the company with an option to purchase more).

obligations on behalf of [GDP], bringing third parties into contractual relations with [GDP]." *Southeastern Fidelity Ins. Co. v. Heard*, 123 Ga. App. 635 (3) (b) (182 SE2d 153) (1971).

*Atlanta Market*, 269 Ga. at 606 (1) (a).

Section 2 (c) of Layne's employment agreement provided specifically that "Employee will not, without the specific written direction of the Company, have authority to bind the Company for any debt or obligation and will not, through any words or actions, indicate otherwise to any person, firm, or corporation." But despite this clear and unequivocal language, GDP urges that Layne did in fact have the authority to enter into contracts with its customers, and that, therefore, the trial court erred by finding that no question of fact existed as to his authority to bind the company. GDP also argues that the trial court erred by refusing to consider parol evidence, i.e., Gordon's testimony, that this provision was intended to simply limit Layne's ability to bind GDP to obligations other than customer contracts and employee relations, such as binding GDP to debts and loans from banks. But this provision was clear and unambiguous and its terms cannot be varied by parol evidence. OCGA § 24-6-1. "(W)here the terms of the contract are clear and unambiguous, the court looks only to the contract to find the parties' intent." (Citation and punctuation omitted.) *In re Estate of Belcher*, 299 Ga. App. 432, 435 (1) (a) (682 SE2d 581) (2009).

Moreover, even assuming that Layne had the authority to bind GDP with respect to customer contracts, the breach of fiduciary duty alleged here concerned Layne's alleged solicitation of his co-workers at GDP, and there is no evidence he had the authority to bind the company on employment matters or relations. Thus, although Layne may have owed GDP a fiduciary duty with respect to the customer contracts he entered into on its behalf, there is no evidence he occupied a similar confidential relationship with respect to employee relations. See *Atlanta Market*, 269 Ga. at 607 (1) (b) (Although "[t]he employee-employer relationship is not one from which the law will necessarily imply fiduciary obligations . . . the facts . . . may establish the existence of a confidential relationship . . . *concerning a particular transaction*, . . .") (emphasis supplied).

Based on the foregoing, the trial court did not err in granting summary judgment to Layne on this claim.

5. In light of our holding in Division 4 above, the trial court's grant of summary judgment to STI on GDP's claim that STI aided and abetted Layne's breach of fiduciary duty is also affirmed.

6. Lastly, GDP contends that the trial court erred in granting summary judgment to Layne on GDP's claims for defamation, libel

and slander per se.

GDP points to three statements that it contends Layne published to GDP employees and others to support this claim: that GDP lied to its customers; that GDP was looking for a buyer; and that GDP was beefing up its books to make a sale go through. GDP further contends that because these statements concerned GDP's business, they constitute defamation per se and thus damages are inferred. OCGA § 51-5-4 (a) (3).

> A court looks to the plain import of the words spoken in order to ascertain whether the words constitute slander per se. To be slander per se, the words are those which are recognized as injurious on their face — without the aid of extrinsic proof. Should extrinsic facts be necessary to establish the defamatory character of the words, the words may constitute slander, but they do not constitute slander per se. Thus, the court may not hunt for a strained construction in order to hold the words used as being defamatory as a matter of law, and the negative inference a hearer might take from the words does not subject the speaker to liability for slander per se. Furthermore, when words are defamatory per se, innuendo — which merely explains ambiguity where the precise meaning of terms used in the allegedly slanderous statement may require elucidation — is not needed.

*Bellemeade, LLC v. Stoker*, 280 Ga. 635, 637-638 (631 SE2d 693) (2006). *Zarach v. Atlanta Claims Assn.*, 231 Ga. App. 685 (2) (500 SE2d 1) (1998).

As to the first statement, the record shows that during their negotiations, Layne told Carr that he could not keep his promises to GDP customers and that he later wrote in an e-mail to Carr that "I don't want to lie to my cust[omers] anymore." But Layne never stated that GDP or Gordon lied to customers, or directed him to lie to customers, only that he could not keep his promises to his customers. As the trial court noted, these statements were not defamatory or libelous per se.

As to the other two statements, Jeremy Chick testified in his deposition that Layne told him that Gordon was trying to sell the company and that "they were trying to beef up the company, so that they could make the books look good to sell it." But a statement that a company is looking for a buyer and that it is trying to make itself more attractive to potential buyers is not, in and of itself, damaging or derogatory.

As the trial court correctly concluded, in the absence of evidence

of statements or writings that were defamatory per se, GDP was required to demonstrate its entitlement to special damages. There was no evidence of special damages in this case; therefore, summary judgment was properly granted to Layne on this count as well.

*Judgment affirmed. Smith, P. J., and Mikell, J., concur.*

DECIDED MARCH 16, 2011.

*Parker, Hudson, Rainer & Dobbs, J. Marbury Rainer, Linda G. Carpenter*, for appellant.

*Ford & Harrison, Rachel R. Krause, Valeria R. Cometto, John L. Monroe, Jr., Davis, Matthews & Quigley, Matthew R. Thiry, Robert O. McCloud, Jr.*, for appellees.