In the Supreme Court of Georgia

Decided: November 23, 2015

S15A1021. METRO ATLANTA TASK FORCE FOR THE HOMELESS,
INC. v. ICHTHUS COMMUNITY TRUST et al.
S15X1022.  CENTRAL ATLANTA PROGRESS et al. v. METRO
ATLANTA TASK FORCE FOR THE HOMELESS, INC. et al.
S15X1023. PREMIUM FUNDING SOLUTIONS, LLC v. METRO
ATLANTA TASK FORCE FOR THE HOMELESS, INC. et al.
S15X1024. EMANUEL FIALKOW v. METRO ATLANTA TASK FORCE
FOR THE HOMELESS, INC. et al.
S15A1027.  CENTRAL ATLANTA PROGRESS et al. v. METRO
ATLANTA TASK FORCE FOR THE HOMELESS, INC. et al.
S15A1028.  PREMIUM FUNDING SOLUTIONS, LLC v. METRO
ATLANTA TASK FORCE FOR THE HOMELESS, INC. et al.
S15A1029.  EMANUEL FIALKOW v. METRO ATLANTA TASK FORCE
FOR THE HOMELESS, INC. et al.
S15X1030/S15X1031. METRO ATLANTA TASK FORCE FOR THE
HOMELESS, INC. v. ICHTHUS COMMUNITY TRUST et al.; and vice versa.

BENHAM, Justice.

These matters come to us from our grant of applications for interlocutory

review.  At issue are two lower court orders: an order lifting a stay and allowing

for the filing of a dispossessory action and an order deciding the validity of

several substantive issues on summary judgment.  For reasons provided below,

we do not reach the merits of the order granting leave to file a dispossessory action and we affirm in part and reverse in part the summary judgment order.

The relevant facts show that Metro Atlanta Task Force for the Homeless (the "Task Force") operates a homeless shelter in a building located at the corner of Peachtree Street and Pine Street in downtown Atlanta ("the property"). The Task Force owned the property unencumbered from 1997 to 2001, when it took out a total of $900,000 in loans with its two original lenders–Institute for Community Economics ("ICE") and the McAuley Institute, which transferred its promissory note and security deed to Mercy Housing, Inc. ("Mercy").[1] In 2009, the Task Force was in default on its loans with ICE and Mercy, but the parties entered into forbearance agreements in which ICE and Mercy agreed to do nothing on the notes until February 28, 2010. On January 26, 2010, however, defendant Ichthus Community Trust ("Ichthus")[2] purchased the outstanding notes from ICE and Mercy for $781,112.84.[3] Ichthus used money

---

[1]Mercy Housing, Inc. transferred its rights to the Mercy Loan Fund. For the purposes of this opinion, we will refer to these two entities collectively as "Mercy."

[2]Ichthus was formed on January 11, 2010.

[3]The Task Force owed $822,262.84 when the forbearance agreement was entered into in 2009.

borrowed from defendant Premium Funding Solutions, LLC ("PFS") to buy the notes. After the forbearance period had expired and the Task Force had not made payment, Ichthus foreclosed on the property and sold it on the courthouse steps on May 4, 2010. Ichthus, as the sole bidder, purchased the property for at least the amount it paid for the notes.[4] On May 21, 2010, Ichthus filed an action against the Task Force in the superior court requesting temporary and permanent injunctive relief in the form of access to the property and the eviction of the Task Force. At the same time, Ichthus also filed a dispossessory action in magistrate court; but this action and any other dispossessory efforts by Ichthus were ultimately stayed on June 17, 2010, by consent order. In the superior court action, the Task Force counterclaimed for injunctive relief to maintain its right of possession (wrongful foreclosure) and to quiet title in the property. In addition, the Task Force counterclaimed for: violations of Georgia's Racketeer Influenced and Corrupt Organizations (RICO) Act; tortious interference with business relations; libel, slander and defamation; bad faith; and punitive damages. In June 2010, the Task Force filed a separate action against Central

---

[4]There is some evidence in the record showing that Ichthus paid $900,000 for the property at the foreclosure sale.

Atlanta Progress ("CAP"), Atlanta Downtown Improvement District ("ADID"), Benevolent Community Investing Company, LLC ("BCIC"), PFS,[5] and Emanual Fialkow[6] ("defendants") for the same relief it counterclaimed for against Ichthus. In 2011, while these actions were pending, Ichthus defaulted on its loan obligation with PFS and, as a result, Ichthus executed a warranty deed and transferred its interest in the property to PFS.

In 2013, the parties argued defendants' motions for summary judgment before a special master who issued an order on January 25, 2014, concluding that the Task Force has viable claims for a jury to decide--specifically, its claims for wrongful foreclosure, quiet title, tortious interference, bad faith, and punitive damages. The parties filed objections to the special master's summary judgment order and the trial court heard argument on July 11, 2014. On August 8, 2014, the trial court adopted the special master's order on summary judgment. In addition, the trial court issued an order granting PFS's motion for leave to file

---

[5]PFS was added as a party in 2011.

[6]On March 2, 2009, defendant Fialkow, who is a businessman, made an offer of $2.1 million dollars to buy the property from the Task Force, but the offer was turned down. Fialkow also approached ICE and Mercy in or about April 2009 to inquire as to whether they were willing to sell the notes on the property and they declined to sell at that time. Other facts related to defendant Fialkow will be set forth below as necessary.

4

a dispossessory action against the Task Force. The trial court issued a certificate of immediate review on August 18, 2014. We granted the parties' interlocutory applications for review; the parties' appeals and cross-appeals were docketed to the April 2015 Term of this Court; and we heard oral argument on June 2, 2015. For the reasons set forth below, we dismiss as moot the appeal concerning the order granting leave to file a dispossessory action and we affirm in part and reverse in part the summary judgement order as adopted by the trial court.

*Order Granting PFS Leave to File Dispossessory Action*[7]

1. The Task Force contends the trial court erred when it granted PFS's motion for leave to file a dispossessory action.

   a. Jurisdiction

It is "incumbent upon this Court, even when not raised by the parties, to inquire into its own jurisdiction." Advanced Disposal Services Middle Georgia LLC v. Deep South Sanitation, LLC, 296 Ga. 103 (1) (765 SE2d 364) (2014). In this case, by lifting a stay and finding that PFS could file a dispossessory

---

[7]See appeal number S15A1021.

5

action prior to the resolution of matters pending for trial after summary judgment, the trial court has effectively dissolved injunctive relief which was shielding the Task Force from efforts to remove it from the property during the course of the proceedings in the main case. Accordingly, this Court has subject matter jurisdiction pursuant to Ga. Const. of 1983, Art. VI, Sec. VI., Par. III (2) and the Task Force was entitled to immediately appeal the trial court's order pursuant to OCGA § 5-6-34 (a) (4). Once our equity jurisdiction is invoked, we may consider appeals and cross-appeals of other rulings in the case pursuant to OCGA §§ 5-6-34 (d) and 5-6-38 (a).

b. Merits

Relying on Howard v. GMAC Mortgage, LLC, 321 Ga. App. 285 (739 SE2d 453) (2013), the trial court determined that PFS could file a dispossessory action while the main case is still pending and it terminated the stay prohibiting the filing of any such action. The Task Force claims this ruling is an error. We conclude that the issue is moot.

After Ichthus transferred its interest in the property to PFS in 2011, PFS filed a dispossessory action and it received a writ of possession from the trial

court in February 2012.  On appeal, however, the Court of Appeals reversed the granting of the writ of possession based on the trial court's failure to follow the appropriate procedures.  See Metro Atlanta Task Force for the Homeless, Inc. v. Premium Funding Solutions, LLC, 321 Ga. App. 100 (1) (741 SE2d 225) (2013).  The trial court then issued the instant order granting leave to file a dispossessory action and this Court denied the Task Force's emergency motion for supersedeas while the instant appeal was pending before us. The Task Force then filed a motion to dismiss and plea in abatement below.  The trial court granted the plea in abatement and PFS filed an appeal with the Court of Appeals.  After this Court heard oral argument in the instant appeal, the Court of Appeals issued a decision in Premium Funding Solutions, LLC v. Metro Atlanta Task Force for the Homeless, 333 Ga. App. 718 (776 SE2d 504) (2015) (physical precedent only), upholding the grant of the plea in abatement and neither party petitioned for certiorari.[8]  Based on these developments, we conclude that the instant allegation of error is moot inasmuch as the Task Force has successfully obtained a remedy at law for the dispossessory action filed by

_____

[8]We therefore express no opinion regarding the merits of that decision.

7

PFS. The Court of Appeals decision is also res judicata as to any future dispossessory actions between these parties while the case remains pending. See Waggaman v. Franklin Life Ins. Co., 265 Ga. 565 (458 SE2d 826) (1995) ("A prior action may bar a subsequent action under the doctrine of res judicata if the prior action resulted in an adjudication by a court of competent jurisdiction and the two actions have an identity of parties and subject matter."). Accordingly, appeal number S15A1021 is dismissed as moot. See OCGA § 5-6-48 (e). See also Wetzel v. State, __ Ga. __, n. 11 (__ SE2d __), 2015 WL 6630379 (Nov. 2, 2015).

*Summary Judgment Rulings*[9]

"On appeal from the grant of summary judgment this Court conducts a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." (Citation and punctuation omitted.) Giles v. Swimmer, 290 Ga. 650 (1) (725 SE2d 220) (2012). The defendants and the Task Force allege errors concerning

___

[9]The summary judgment rulings concern the following appeals and cross-appeals: S15X1022, S15X1023, S15X1024, S15A1027, S15A1028, S15A1029, S15X1030, and S15X1031.

8

some of the summary judgment rulings made by the special master and adopted by the trial court. We discuss each alleged error, including any additional alleged facts, in turn.

### 2. Conspiracy and Tortious Interference Claims

### a. Conspiracy

In this case, the Task Force alleges that, since 2006, defendants have conspired to engage in tortious activities with the common design or goal of permanently depriving the Task Force of the property. The defendants in general and defendant Fialkow in particular allege there was no such conspiracy and that no actionable torts were committed against the Task Force. The special master and the trial court determined there are disputed issues of material fact which must be resolved by a jury as to whether a civil conspiracy was afoot amongst the defendants.

This Court has defined a civil conspiracy as follows:

> A conspiracy upon which a civil action for damages may be founded is a combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort. Where civil liability for a conspiracy is sought to be imposed, the conspiracy itself furnishes no cause of action. The gist of the action, if a cause of action exists, is not the conspiracy alleged, but the tort committed against the plaintiff and

9

the resulting damage. Thus, where the act of conspiring is itself legal, the means or method of its accomplishment must be illegal.

While the conspiracy is not the gravamen of the charge, it may be pleaded and proved as aggravating the wrong of which the plaintiff complains, enabling him to recover in one action against all defendants as joint tort-feasors.

The conspiracy may be pleaded in general terms, and this is true although the jurisdiction of the court to render judgment against one or more of the defendants depends upon allegations and proof of the conspiracy.

If no cause of action is otherwise alleged, the addition of allegations concerning conspiracy will not make one; but, where a cause of action is alleged, the fact of conspiracy, if proved, makes any actionable deed by one of the conspirators chargeable to all.

(Citations and quotations omitted.) Cook v. Robinson, 216 Ga. 328 (1)-(4) (116 SE2d 742) (1960). Tortious interference with a business relationship is a cause of action for which proof of a civil conspiracy will expand liability among all co-conspirators. See id.; Alta Anesthesia Associates of Georgia, P.C. v. Gibbons, 245 Ga. App. 79 (3) (537 SE2d 388) (2000). The essential element of a civil conspiracy is a common design. Outside Carpets, Inc. v. Industrial Rug Co., 228 Ga. 263, 269 (185 SE2d 65) (1971). The existence of a conspiracy may "be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances."

10

(Citation and punctuation omitted.)  Nottingham v. Wrigley, 221 Ga. 386, 388 (144 SE2d 749) (1965).  It is usually within the province of the jury to draw such inferences; and so cases involving an alleged civil conspiracy are typically not resolved on summary judgment.  Outside Carpets, Inc. v. Industrial Rug Co., supra, 228 Ga. at 269 (the resolution of a conspiracy claim was not appropriate for summary judgment); Tyler v. Thompson, 308 Ga. App. 221 (3) (707 SE2d 137) (2011) (trial court erred in granting summary judgment on civil conspiracy issue).

Fialkow contends that the special master and trial court erred in denying him summary judgment on the issue of conspiracy[10] because, he argues, there is no evidence he interfered with any of the relationships at the heart of the Task Force's tort claims, which are discussed in detail below.  There is evidence, however, that Fialkow may have been part of a concerted action with a common design insofar as his role in acquiring the notes on the property through defendant Ichthus.  For instance, there is evidence that Fialkow communicated with A.J. Robinson about his intent to form Ichthus as a vehicle to purchase the

_____

[10]The other defendants do not challenge the conspiracy claim directly, but address the allegations through the individual tortious interference claims, which are discussed below.

11

notes from ICE and Mercy after his efforts to approach the Task Force to buy the property and to approach lenders to buy the notes were turned down in early 2009. There is also evidence that PFS is majority-owned by Sunshine Property Group, a company which is owned by defendant Fialkow's wife; there is evidence that Fialkow transferred, from his wife's bank account, the money that PFS used to loan Ichthus when it purchased the notes from ICE and Mercy in 2010; and there is some evidence that the sole officer and director of Ichthus is defendant Fialkow's longtime assistant. Thus, should a jury determine that a conspiracy existed, then Fialkow could be held jointly liable for any torts committed by the other defendants to effect the common design of the conspiracy, even if he did not directly engage in each and every tort alleged.[11] See Dee v. Sweet, 218 Ga. App. 18 (4) (460 SE2d 110) (1995). Given the issues of material fact that exist, as discussed below, and because civil conspiracy claims may be properly resolved by a jury, the special master and trial court did not err in denying summary judgment to Fialkow and the other defendants on the civil conspiracy claim.

---

[11]In addition to the various tortious interference claims, Fialkow could also be liable for the Task Force's claim of wrongful foreclosure under a theory of civil conspiracy. See, e.g., Wilson v. Mountain Valley Community Bank, 328 Ga. App. 650 (1) (b) (759 SE2d 921) (2014).

b. Tortious Interference with Charitable Donation/ Private Funding

The Task Force alleges that defendants engaged in conduct which led Dan Cathy, the President and Chief Operating Officer of Chick-fil-A, Inc., to discontinue his charitable contributions to the shelter. On summary judgment, the Task Force argued that the relevant analysis to be applied was tortious interference with a business relationship. See Witty v. McNeal Agency, Inc., 239 Ga. App. 554, 561 (521 SE2d 619) (1999). The defendants countered that the relevant analysis was tortious interference with a gift. See Morrison v. Morrison, 284 Ga. 112 (663 SE2d 714) (2008). The special master rejected the defendants' argument and applied the business relationship analysis advocated by the Task Force. The special master ultimately concluded, and the trial court agreed, the claim needed to go to a jury.

Georgia's appellate courts have recognized a cause of action for interference with an economic expectancy in the form of a gift within the context of receiving an inheritance or otherwise receiving a benefit upon the death of another (i.e., payment on a life insurance policy). See id. at 113; Morgan v. Morgan, 256 Ga. 250, 251 (347 SE2d 595) (1986); Mitchell v. Langley, 143 Ga. 827, 835 (85 SE 1050) (1915); Ford v. Reynolds, 315 Ga.

13

App. 200 (726 SE2d 687) (2012). Indeed, our jurisprudence is similar, in this respect, to the Restatement (Second) of Torts § 774B (1979), "Intentional Interference with Inheritance or Gift,"[12] which likewise contemplates such claims and similar "noncontractual"[13] relationships in the context of inheritance. Compare Restatement (Second) of Torts § 766B (1979), "Intentional Interference with Prospective Contractual Relation."[14]

---

[12]The Restatement (Second) of Torts § 774B provides:

One who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift.

[13]Comment (a) to the Restatement (Second) of Torts § 774B provides in pertinent part:

This Section represents an extension to a type of noncontractual relation of the principle found in the liability for intentional interference with prospective contracts stated in § 766B. It does not purport to cover liability for negligence when the actor, in attempting to effectuate an inheritance or gift, breaches a duty to use reasonable care that he owes to the donee as well as the donor.

[14]The Restatement (Second) of Torts § 766B provides:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

Although Georgia appellate courts have not considered or analyzed such a tort beyond the context of inheritance, given the unique circumstances of this case, we agree with defendants that a charitable donation to the Task Force is more akin to a gift than it is akin to a traditional business relationship. See, e.g., Comment (b) to the Restatement (Second) of Torts § 774B.[15] Unlike a traditional business relationship where the parties have some agreement or contract that is mutually beneficial and where there is some consequence for non-compliance with said agreement or contract, a charitable donor has no

According to Comment (c), the relationships contemplated by this Restatement are those relations that will eventually lead to a formal contract or relations that are customary in nature:

> The relations protected against intentional interference by the rule stated in this Section include any prospective contractual relations, except those leading to contracts to marry [cit.], if the potential contract would be of pecuniary value to the plaintiff. Included are interferences with the prospect of obtaining employment or employees, the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts. Interference with the exercise by a third party of an option to renew or extend a contract with the plaintiff is also included. Also included is interference with a continuing business or other customary relationship not amounting to a formal contract. In many respects, a contract terminable at will is closely analogous to the relationship covered by this Section.

[15]Comment (b) to the Restatement (Second) of Torts § 774B provides in pertinent part:

> "Gift" is used to include in the broad sense any donation, gratuity or benefaction that the other would have received from the third person. It includes, for example, the designation of the other as a beneficiary under an insurance policy, with which the actor interferes by tortious means.

15

obligation to bestow a gift; and the recipient typically has no obligation to give anything or do anything[16] in return for the gift. Furthermore, a charitable donor can, more often than not, choose not to make a gift without any consequence.

In Mitchell v. Langley, supra, 143 Ga. at 835, this Court held:

> [W]here an intending donor... has actually taken steps toward perfecting the gift, or devise, or benefit, so that if let alone the right of the donee, devisee, or beneficiary will cease to be inchoate and become perfect, we are of the opinion that there is such a status that an action will lie, if it is maliciously and fraudulently destroyed, and the benefit diverted to the person so acting, thus occasioning loss to the person who would have received it.

See also Ford v. Reynolds, supra, 315 Ga. App. at 202. Thus, to establish a claim for tortious interference with a gift under Georgia law, a plaintiff must show that the donor took steps toward perfecting the gift; that the defendant engaged in fraudulent and malicious conduct to divert the perfection of the gift; and that the defendant diverted the gift away from the plaintiff to himself. If the production of evidence on any of these elements is lacking, then the claim cannot prevail on summary judgment. See id. at 203. While the Task Force has produced evidence that defendants approached Cathy about his donating to the

---

[16]Of course there are legal requirements that a charitable organization act in a manner consistent with its charitable purpose.

16

Task Force, the Task Force has failed to produce any evidence that defendants diverted a charitable donation, which Cathy intended for the Task Force, to themselves. Rather, the evidence is that Cathy donated to the Task Force for two years (2006-2008) and made no further donations to the organization after 2008.[17] As such, the claim cannot survive summary judgment. Id. Accordingly, the special master's and trial court's denying summary judgment on this tortious interference claim is reversed.

### c. Tortious Interference with the Task Force's Lenders

The special master and trial court denied defendants' motions for summary judgment regarding the Task Force's claim of tortious interference with its business relationships with its lenders ICE and Mercy. Defendants allege the special master and trial court relied on "pure speculation" and "inadmissible evidence" in denying summary judgment on this claim. Defendants also assert their actions are privileged, and not wrongful. We find no error.

---

[17]With such a limited donation period, two years out of the eleven years the Task Force had been operating at the property as of 2008, we likewise cannot conclude that Cathy's donations were "customary" in nature. See Comment (c) to Restatement (Second) of Torts § 766B.

17

i. The Task Force became indebted to ICE and Mercy in 2001 and was in default on the notes for several years thereafter. In the fall of 2008, defendants' representatives had discussions with representatives of ICE and Mercy. There is some dispute as to who initiated these discussions, but no dispute that the conversations took place. The topics of discussion included the defaulted notes on the property and the future disposition of the property– namely, whether ICE and Mercy would be selling the outstanding notes, including selling the notes to defendant CAP or to defendant Fialkow, or foreclosing on the property. A representative from Mercy took notes during a November 2008 conference call with some of defendants' representatives. Those notes indicate that the Task Force's shelter was described during the call as "poorly run" and as "a drag on the city." These negative characterizations of the Task Force are attributed to A.J. Robinson, president of defendants CAP and ADID.

In 2009, after an alleged discussion with Robinson, defendant Fialkow made inquiries of ICE and Mercy about purchasing the notes on the property, but the lenders declined Fialkow's overtures at that time. Fialkow continued to communicate with Robinson about the disposition of the Task Force's property.

18

In 2010, Fialkow created defendant corporation Ichthus, and that entity, with money borrowed from defendant PFS, purchased the notes from ICE and Mercy, foreclosed on the property, and, as the sole bidder, purchased the property at the foreclosure sale.

The appellate courts of this state have recognized a claim for the tortious interference with a business relationship. See Wilansky v. Blalock, 262 Ga. 95 (2) (414 SE2d 1) (1992); Tribeca Homes, LLC v. Marathon Inv. Corp., 322 Ga. App. 596 (2) (745 SE2d 806) (2013); Gordon Document Products, Inc. v. Service Technologies, Inc., 308 Ga. App. 445 (2) (708 SE2d 48) (2011). This recognition includes situations where it is alleged that tortious conduct by the defendant caused an entity to discontinue a business relationship with the plaintiff. Tribeca Homes, LLC v. Marathon Inv. Corp., 322 Ga. App. at 598. Indeed, a plaintiff may sustain a claim for tortious interference with a business relationship where he establishes:

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

19

Id. There is no requirement that a valid contract already exist to establish or maintain a claim for tortious interference with a business relationship. See Renden, Inc. v. Liberty Real Estate Ltd. Partnership III, 213 Ga. App. 333 (2) (444 SE2d 814) (1994). See also Comment (c) to Restatement (Second) Torts § 766B.

As to the first element of a tortious interference with a business relationship claim, to be "without privilege" means that the defendant is a stranger to the business relationship. Cox v. City of Atlanta, 266 Ga. App. 329 (1) (596 SE2d 785) (2004). Here, defendants were not in any way privy to the relationships that the Task Force formed with ICE and Mercy in 2001. Defendants were not parties to the loans, nor were they intended beneficiaries of the loans. The Task Force's subsequent default on the loans did not create a privileged status for defendants simply because of defendants' general concern for the business environment in downtown Atlanta.

Defendants also take issue with the conclusions that may be drawn from statements attributed to A.J. Robinson during the 2008 telephone conference call with Mercy and ICE representatives, challenging whether such evidence is proof

of improper action or wrongful conduct on the part of defendants. See <u>Disaster Services, Inc. v. ERC Partnership</u>, 228 Ga. App. 739, 741 (492 SE2d 526) (1997) ("Improper actions constitute conduct wrongful in itself; thus, improper conduct means wrongful action that generally involves predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions.") (Internal quotations omitted). Robinson's comments, however, cannot be viewed in isolation. Additional evidence suggests that defendants may have been improperly interfering with the relationships between the Task Force and the lenders by making misleading statements about the Task Force in order to persuade the lenders to sever their relationship with the Task Force, either through foreclosure or sale of the notes. For example, there is documentary evidence that a Mercy executive, after speaking with defendants and others in November 2008, began considering foreclosing on the property because she had developed a concern that the Task Force was only "warehousing" the homeless and not providing them with services. In contrast, there is evidence in the record that the Task Force provided services, including job counseling and substance abuse counseling, to homeless people in addition to providing shelter

21

to 30% of Atlanta's homeless population. In January 2009, Robinson sent an email about the property indicating that he had Mercy "very close to initiating foreclosure proceedings." Still, defendants counter there is no evidence that any "decision-maker" from ICE or Mercy was moved by anything Robinson said about the Task Force and point to the fact that ICE and Mercy never foreclosed on the property. However, ICE and Mercy sold the notes to Ichthus, an entity associated with defendant Fialkow, and Ichthus foreclosed on the notes in short order. There is a genuine dispute of material fact as to whether the defendants, by making targeted misrepresentations about the Task Force, influenced the severing of the Task Force's relationships with ICE and Mercy and the courts are not authorized to reconcile such a dispute on summary judgment.[18] See Georgia Canoeing Association v. Henry, 263 Ga. 77, 78 (428 SE2d 336) (1993).

ii. Defendants next argue that the special master erred by relying on the affidavit of Raylene Clark, who was a former ICE employee. Defendants opine that, at trial, Clark would not be able to testify about what other

---

[18]Defendants allege that this November 2008 conference call was initiated by Mercy and not by any of the defendants. Inasmuch as defendants suggest that who initiated these various conversations was determinative of defendants' motives or intent in regard to this tortious interference claim, such disputed matters are for a jury.

22

individuals knew about facts related to comments made about the Task Force.

In his summary judgment order, the special master made the following

observations about Clark's affidavit:

> As evidence of Defendants' efforts to induce the lenders to discontinue their relationship with the Task Force, the Task Force submitted the Affidavit of Raylene Clark, who was employed by ICE for more than 16 years. In 2001, Ms. Clark was responsible for recommending that ICE lend the Task Force $600,000 for renovations of the building on the Property. Ms. Clark was also involved in the oversight of the disbursement of the loan from ICE to the Task Force and had direct responsibility for overseeing the performance of the Task Force loan from the date it was made until the date it was set to mature, on or about June 15, 2006. Ms. Clark testified that she heard negative statements about the Task Force by third-parties, whom she did not identify. She recalled those statements being about "the Task Force being in disputes with the City, being in financial distress and unlikely to pay back its Notes, not doing good work for the homeless, that [a certain financial supporter of the shelter] was not willing to support them anymore because of other issues in his life, and that the community felt the shelter was in the wrong location."

> Ms. Clark's Affidavit states that although ICE had previously sent notice of default to the Task Force, the Task Force was highly regarded by ICE. She directly refutes the assertion by CAP and ADID that the relationship between the Task Force and ICE was strained or damaged by the end of 2007.

> However, Ms. Clark stated that negative comments did have a very significant impact on the relationship between ICE and the Task Force: "Among other things, ICE and [its successor organization] began to have weekly meetings about the Task Force and switched

23

from a state of mind where they were supportive of the Task Force to where they wanted to get out of the relationship. I felt a similar shift in the attitude towards the Task Force at Mercy."

The special master's observations are an accurate summary of the Clark affidavit. Clark stated in her affidavit that she heard negative comments about the Task Force in 2008. She did not state that someone else told her about negative comments being made about the Task Force. Accordingly, there appears to be no hearsay issue that would prevent Clark's affidavit from being considered on summary judgment. See OCGA § 24-8-801 (c). Furthermore, the special master did not solely rely on Clark's affidavit to make its decision. We find no reason to upset the decision to deny summary judgment regarding this claim.

d. Tortious Interference with the Task Force's Public Funding

Defendants claim the special master and trial court erred when they denied summary judgment on the Task Force's claim that they tortiously interfered with the Task Force's ability to obtain grant funding from the Georgia Department of Community Affairs (GDCA). The evidence shows that in 2007, the Task Force submitted applications for grant funding dispensed through the GDCA for

24

five programs. A precondition for applying for grant funding was certification from the City of Atlanta, and the Task Force received such certification from the City prior to submitting its applications. While the applications were still under review by the GDCA, the chief of staff for the mayor wrote a letter to the GDCA recommending that the Task Force not be funded for any of the five programs for which it had applied in spite of the City's prior certification. The GDCA ultimately made the decision not to issue any funding to the Task Force in 2007. In 2008, the City certified two of four of the Task Force's programs to the GDCA and the mayor's chief of staff again sent a letter explaining the reasons it would not support funding for all four programs. In 2009, the City certified all five programs set forth by the Task Force, but the mayor's chief of staff included a letter asserting that the City had concerns about the programs.

The Task Force alleges defendants, by making misrepresentations about the Task Force to City personnel, facilitated or influenced the City's sending of the letters to the GDCA to the Task Force's detriment. The record includes documentation from 2007 that defendants wanted to "shut off public funding to the shelter." There is also documentation from 2008 that defendants wanted to limit their direct communication with the City about the Task Force because of

25

concerns that such communication would be subject to a "FOI" (freedom of information) request. A City advisor on homelessness was involved first hand in the discussions defendants had about the Task Force's public funding. This advisor on homelessness worked with and counseled the mayor's chief of staff at the time he wrote the 2007 and 2008 letters to the GDCA about publicly funding Task Force programs and she consulted the City about the 2009 certificates.[19] The record shows that at least one of the letters from the mayor's chief of staff echoed the statement, which is attributed to defendants, that the Task Force was merely "warehousing" the homeless and not providing services.[20]

Defendants argue that they are protected from any liability on this claim pursuant to OCGA § 9-11-11.1, which is Georgia's anti-SLAPP[21] statute. Defendants urge that the opinions expressed in the mayor's chief of staff's

[19]In addition, the special master found there was sufficient proof of bribery regarding this same advisor on homelessness as it pertained to the Task Force's racketeering claim, which is discussed, infra, at Division 6 of this opinion.

[20]The Task Force alleges this statement and other similar statements are false and misleading.

[21]SLAPP stands for "strategic lawsuit against public participation." See Atlanta Humane Society v. Harkins, 278 Ga. 451 (603 SE2d 289) (2004).

letters to the GDCA are the type of statements subject to the anti-SLAPP statute. This may be true. But the issue at the crux of the Task Force's tortious interference claims is whether the defendants, along with the advisor on homelessness as a co-conspirator, improperly influenced the mayor's chief of staff to write the letters to the GDCA recommending that the Task Force not receive funding. For example, there is evidence, in the form of an email, that defendants wanted to "shut off" the Task Force's public funding and wanted to apply "continued pressure" to achieve that goal. A similar email indicated that defendants wanted to "whitt[le] away [] backing and support of [the] Task Force," and that defendants had plans on "attacking the cred[i]bility of [the Task Force] with ...public funders."

For a communication to fall under the protection OCGA § 9-11-11.1, it must be privileged pursuant to OCGA § 51-5-7 (4). See OCGA § 9-11-11.1 (b); Atlanta Humane Society v. Harkins, 278 Ga. 451 (2) (603 SE2d 289) (2004). OCGA § 51-5-7 (4) provides that the following statements are privileged: "[s]tatements made in good faith as part of an act in furtherance of the right of free speech or the right to petition government for a redress of

grievances under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern...." However, the privilege cannot be "used merely as a cloak for venting private malice...." (Internal quotations omitted) <u>Atlanta Humane Society v. Harkins</u>, supra, 278 Ga. at 455. See also OCGA § 51-5-9 ("In every case of privileged communications, if the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted, the party defamed shall have a right of action.") There are material issues of fact here as to whether defendants made the statements in "good faith" such that their statements were privileged. From the evidence it appears that defendants may have made the statements pursuant to a "private malice." The trial court did not err in denying summary judgment.

3. Quiet Title

The Task Force's claim for quiet title only concerns defendant PFS.[22] As its first enumeration of error, PFS alleges the trial court erred in denying it summary judgment because it contends the Task Force lacks record title such

[22]The special master and trial court previously resolved the quiet title claims against Ichthus, Fialkow, CAP, and ADID by dismissing them. On motion for summary judgment, the quiet title claims against these defendants were denied as moot.

28

that it has no standing to sue. In addition, PFS argues that the forbearance agreements that the Task Force entered into with ICE and Mercy bar the quiet title claim. We agree that the quiet title action is not viable.

PFS contends that the Task Force lost "record" title to the property in 2001 when it originally took out loans against the property and, as such, the Task Force has no standing to assert a claim for quiet title. According to Georgia law, a deed to land for the purpose of securing a debt passes legal title to the lender. See West Lumber Co. v. Schnuck, 204 Ga. 827 (1) (51 SE2d 644) (1949). Such a deed does not, however, transfer equitable title. See Chase Manhattan Mortgage Corp. v. Shelton, 290 Ga. 544 (3) (722 SE2d 743) (2012); Tomkus v. Parker, 236 Ga. 478 (1) (224 SE2d 353) (1976). That is, the lender does not gain complete title over the property unless and until it forecloses thereon. See Vereen v. Deutsche Bank National Trust Company, 282 Ga. 284, 285 (646 SE2d 667) (2007); McCarter v. Bankers Trust Co., 247 Ga. App. 129 (543 SE2d 755) (2000). Therefore, the fact that the lender holds a security deed does not mean the debtor is completely divested of title. In this case, however, since Ichthus, rightly or wrongly, foreclosed on the property in 2010, the Task Force was divested of all title at that point. Accordingly, the special master and

29

the trial court erred when they denied defendants summary judgment on the quiet title claim.[23]  See Dykes Paving and Construction Co., Inc. v. Hawk's Landing Homeowners Assoc., Inc., 282 Ga. 305 (647 SE2d 579) (2007) ("To state a claim for quiet title relief, a plaintiff must allege more than a right to acquire title; it must allege that it presently holds current title or current prescriptive title."); In Re Rivermist Homeowners Assoc., Inc., 244 Ga. 515, 518 (260 SE2d 897) (1979) (In order to have standing to maintain a action to quiet title, "a plaintiff must assert that he [h]olds some current record title or current prescriptive title, in order to maintain his suit. Otherwise, he possesses no title at all, but only an expectancy...").[24]

    4.  Wrongful Foreclosure

        a.  Tender

The defendants argue that the Task Force cannot move forward on its wrongful foreclosure claim because it has not tendered the amount that it owes on the outstanding notes.  It is true that in a typical wrongful foreclosure action,

---

[23]We need not reach PFS's argument regarding the effect of the forbearance agreements.

[24]Here, the Task Force only has an expectancy that it may regain title should it prevail on its wrongful foreclosure claim.

the plaintiff is required to tender the amount due under the security deed and note in order to maintain an action in equity.[25]  See Berry v. Government National Mortgage Association, 231 Ga. 503 (202 SE2d 450) (1973). Long ago, however, this Court indicated that tender is not an absolute rule, especially where it is alleged that the foreclosing party procured the sale of the property through its own improper conduct:

> Equity believes in good conscience, honesty, and morality.  It will not sanction oppression or extortion demanded by a party because of his own illegal act.   If he demands his pound of flesh, he must take it without the letting of blood. A party who violates the law knowingly and willfully, and thereby injures another, cannot demand of the latter party to 'do equity' before he can establish his right and place himself in statu quo.

Benedict v. Gammon Theological Seminary, 122 Ga. 412 (3) (50 SE 162) (1905).  See also Coates v. Jones, 142 Ga. 237 (82 SE 649) (1914) (plaintiff was exempt from tender and was allowed to maintain an equitable petition to have a sheriff's sale set aside under circumstances which included fraudulent conduct by the defendant); OCGA §  23-1-3 ("Equity jurisdiction is established and allowed for the protection and relief of parties where, from any peculiar

---

[25]In this case, the Task Force is seeking injunctive relief to retain the property.

31

circumstances, the operation of the general rules of law would be deficient in protecting from anticipated wrong or relieving for injuries done.").

In this case it is alleged that the sale of the notes was procured via improper actions of the defendants that constituted tortious interference with the Task Force's relationships with its lenders and private and public funding sources.[26] As indicated above, there are material issues of fact that need to be resolved by a jury regarding some of these tort claims. The alleged tortious conduct in this case may have prevented the Task Force from tendering its debt and is sufficient to create an exception to the tender requirement as contemplated in Benedict v. Gammon Theological Seminary, supra. This is not a case like many others over the years, where a party sought to excuse its failure to tender on grounds like poverty, non-compliance with foreclosure procedures, or other acts not involving tortious interference with the funds that would potentially comprise the tender itself. See, e.g., Smith v. Citizens & Southern Financial Corp., 245 Ga. 850 (1) (268 SE2d 157) (1980) (party's lack of personal liability for the underlying debt not an excuse for failing to tender);

---

[26]There is some evidence that since 2006, the Task Force's annual funding went from $1.7 million to a few hundreds of dollars.

<u>Berry v. Government National Mortgage Association</u>, 231 Ga. 503 (202 SE2d

450) (1973) (poverty not an excuse for failure to tender); <u>Stewart v. Suntrust

Mortgage, Inc.</u>, 331 Ga. App. 635 (6) (770 SE2d 892) (2015) (plaintiff alleging

failure to follow foreclosure procedures not excused from tender). Accordingly,

the special master and trial court did not err in allowing the wrongful foreclosure

claim to proceed in the absence of payment of the amounts owed on the notes.

b. Merits

Defendants also contend that the wrongful foreclosure claim cannot be

sustained on the merits.

> To assert a viable claim for wrongful foreclosure, a plaintiff must
> establish a 'legal duty owed to it by the foreclosing party, a breach
> of that duty, a causal connection between the breach of that duty
> and the injury it sustained, and damages.' The legal duty imposed
> upon a foreclosing party under a power of sale is to exercise that
> power fairly and in good faith.

 (Citation omitted.) <u>Wells Fargo Bank, N.A. v. Molina-Salas</u>, 332 Ga. App. 641

(1) (774 SE2d 712) (2015). One way to prevail in a wrongful foreclosure action

is to show that the foreclosure sale price was grossly inadequate and that the

grossly inadequate price was "accompanied by either fraud, mistake,

misapprehension, surprise or other circumstances which might authorize a

33

finding that such circumstances contributed to bringing about the inadequacy of price that such a sale may be set aside by a court of equity." Giordano v. Stubbs, 228 Ga. 75 (3) (184 SE2d 165) (1971). "In determining whether this duty... has been breached [in a wrongful foreclosure action,] the focus is on the *manner* in which the sale was conducted and not solely on the result of the sale." (Emphasis supplied.) Kennedy v. Gwinnett Commercial Bank, 155 Ga. App. 327, 330-331 (1) (270 SE2d 867) (1980). In this case, the special master and the trial court concluded that whether the foreclosure sale price was grossly inadequate was an issue for the jury.

The evidence on summary judgment shows that Ichthus, which was the sole bidder at the foreclosure sale, paid at least $781,112.84, and, possibly up to $900,000 for the property. Just a year prior, defendant Fialkow had offered to purchase the property for $2.1 million. Fialkow also made an admission that the property was worth at least three times what Ichthus paid for it at the foreclosure sale. A real estate broker, who was deposed, stated the property was worth $8.3 million at the time of foreclosure. In addition to the evidence on the purchase price versus the purported value of the property, there are material issues of fact, as discussed above, concerning alleged tortious activities by the

defendants in relation to the purchase of the notes and the foreclosure on the property. This evidence and these issues of material fact go to the heart of whether a breach of duty occurred and whether there was harm to the Task Force. These disputes of material fact must be considered and weighed by a jury to determine whether a wrongful foreclosure occurred. The denial of summary judgment on this issue was not erroneous.

5. Bad Faith

The Task Force raised a claim for attorney fees and litigation expenses pursuant to OCGA § 13-6-11. That statute provides as follows:

> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

The special master and the trial court denied summary judgment to defendants on this claim and defendant Fialkow alleges this was error as to him because there is a genuine controversy between him and the Task Force, precluding any allegation of bad faith. As indicated by the plain language of the statute, the determination of whether there has been bad faith in support of an award pursuant to OCGA § 13-6-11 is normally an issue for a jury. Covington Square

35

Associates, LLC v. Ingles Markets, Inc., 287 Ga. 445, 446-447 (696 SE2d 649) (2010). As discussed above, there are genuine disputes of material fact as to whether defendants acted in bad faith in their dealings related to the Task Force. The special master and the trial court did not err when they denied defendants, including defendant Fialkow, summary judgment on this claim.

6. Racketeering

The special master and trial court ruled in favor of the defendants' motions for summary judgment regarding the Task Force's racketeering claim pursuant to the Georgia RICO Act (see OCGA § 16-14-1, et seq.) because they found the Task Force had failed to produce evidence of at least two predicate acts supporting such a claim. Rather, the special master concluded the Task force was only able to produce evidence establishing one predicate act (bribery) out of the four predicate acts it had alleged in its amended complaint. In its response to defendants' motions for summary judgment, the Task Force asserted the predicate act of wire fraud. Since the Task Force failed to amend its complaint to add a claim of wire fraud, the special master elected not to consider that claim on summary judgment. On appeal, the Task Force alleges the special master and the trial court erred in failing to find an issue of material fact existed

as to whether the defendants had intimidated court officers in violation of OCGA § 16-10-97[27] as one of the predicate acts and erred when they elected not to consider the wire fraud claim. We discuss each allegation in turn.

a. Violation of OCGA § 16-10-97

The special master and the trial court found that the Task Force failed to produce evidence of violations of OCGA § 16-10-32 (b) (1) which concerns

---

[27]OCGA § 16-10-97 states:

(a) A person who by threat or force or by any threatening action, letter, or communication:

(1) Endeavors to intimidate or impede any grand juror or trial juror or any officer in or of any court of this state or any court of any county or municipality of this state or any officer who may be serving at any proceeding in any such court while in the discharge of such juror's or officer's duties;
(2) Injures any grand juror or trial juror in his or her person or property on account of any indictment or verdict assented to by him or her or on account of his or her being or having been such juror; or
(3) Injures any officer in or of any court of this state or any court of any county or municipality of this state or any officer who may be serving at any proceeding in any such court in his or her person or property on account of the performance of his or her official duties shall, upon conviction thereof, be punished by a fine of not more than $5,000.00 or by imprisonment for not more than 20 years, or both.

(b) As used in this Code section, the term "any officer in or of any court" means a judge, attorney, clerk of court, deputy clerk of court, court reporter, community supervision officer, county or Department of Juvenile Justice juvenile probation officer, or probation officer serving pursuant to Article 6 of Chapter 8 of Title 42.

(c) A person who by threat or force or by any threatening action, letter, or communication endeavors to intimidate any law enforcement officer, outside the scope and course of his or her employment, or his or her immediate family member in retaliation or response to the discharge of such officer's official duties shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than one nor more than five years, a fine not to exceed $5,000.00, or both.

37

physical or economic threats designed to prevent someone from participating in an official proceeding.[28]  On appeal, the Task Force complains that the special master and trial court erred by failing to analyze the evidence under OCGA § 16-10-97, which concerns the intimidation of a court officer.  A review of the initial complaint, as well as the first, second, and third amended complaints shows, however, that the Task Force never raised a claim for a violation of OCGA § 16-10-97.  Rather, the Task Force specifically stated in its initial complaint, and its multiple amendments thereto, that it was claiming violations of OCGA § 16-10-32 (b) and OCGA §16-14-3 (9) (A) (xiv), which statutes collectively concern interfering with a person or a witness, who is participating in an official proceeding, by making physical or economic threats.  Therefore, any purported violation of OCGA § 16-10-97 was not properly before the trial

---

[28]OCGA § 16-10-32 (b) (1) provides:
Any person who threatens or causes physical or economic harm to another person or a member of such person's family or household, threatens to damage or damages the property of another person or a member of such person's family or household, or attempts to cause physical or economic harm to another person or a member of such person's family or household with the intent to hinder, delay, prevent, or dissuade any person from:

(1) Attending or testifying in an official proceeding....

court[29] and is not properly before this Court for review.  See Pfeiffer v. Georgia

Department of Transportation, 275 Ga. 827 (2) (573 SE2d 389) (2002).

b.  Wire Fraud

The Task Force raised the predicate act of wire fraud for the first time in

its response to defendants' motions for summary judgment.  In his summary

judgment order, the special master stated he would not consider the wire fraud

argument due to the fact the Task Force had failed to raise the claim in its

amended complaints or counterclaims.  Indeed, in its pleadings, the Task Force

identified the following predicate acts underscoring its racketeering claim:

bribery, attempting to influence persons in relation to official proceedings,

perjury,[30] and battery.  None of the factual allegations surrounding these four

predicate acts can be recast as wire fraud.  The Task Force stated in its briefing

and at oral argument that it learned of the facts underlying the allegation of wire

fraud late in the discovery process and in the midst of having to meet summary

---

[29]It is disingenuous for the Task Force to blame the special master and trial court for failing to apply a statute that was never cited in support of its arguments, particularly when it amended its complaint multiple times.

[30]The allegations concerning perjury also included a subset of allegations regarding false statements and impersonation of an officer.

39

judgment deadlines. The lateness of discovery is an inadequate excuse for the failure to ask for an extension of the summary judgment deadline in order to amend the complaint. See OCGA § 9-11-56 (f). The special master and the trial court did not err in failing to consider this issue in the absence of an amendment to the complaint. The special master and trial court did not err in granting defendants' motions for summary judgment regarding the Task Force's RICO claim.

Judgment affirmed in part and reversed in part in Case Nos. S15A1027, S15X1022, S15A1028, S15X1023, S15A1029, S15X1024, S15X1030, S15X1031. Appeal dismissed in Case No. S15A1021. All the Justices concur.